**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

|  |  |  |
|---|---|---|
| **CHARLENE A. HOLSTE** | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 4:20-CV-00276** |
| | ) | |
| **RTG FURNITURE CORP. OF** | ) | |
| **GEORGIA,** | ) | |
| | ) | |
|     **Defendant.** | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AND BRIEF IN SUPPORT**

Defendant RTG Furniture Corp. of Georgia, ("RTG")[1] moves under Federal Rule of Civil Procedure 56 and Local Rule 56.1 for summary judgment on all of Plaintiff Charlene Holste's claims.

**INTRODUCTION**

When former RTG salesperson Charlene Holste notified the company in July 2019 that she was allergic to certain chemicals, some of which she suspected might be present in cleaners at RTG's Savannah store, RTG acted almost immediately to protect an employee it saw as one of its top local performers.  Store management, district level supervisors, the purchasing department, and HR all engaged with Holste in a good faith process to find cleaners she could tolerate.  From two days after Holste originally

---

[1] Plaintiff's actual employer was RTG Furniture of Georgia Corp.

complained in July 2019, until March 2020, that process produced accommodations for Holste's allergies.

Much as it changed every person's and every company's existence, COVID-19 changed everything for RTG and its ability to accommodate Holste.  No longer could RTG obtain the acceptable substitute cleaner Holste had identified.  No longer could it use vinegar and water to clean the Savannah store as it had before obtaining the substitute.  No longer, in other words, could RTG accommodate Holste without endangering the health and safety of its other employees and its customers.

But RTG did not terminate Holste's employment.  It offered her a choice—an unpaid leave of absence or returning to work in the store with the same chemicals that RTG had used from her first day in September 2018 until July 2019 when she first complained about her allergies.  Holste instead took a third path and quit to go work for an RTG competitor to whom she did not disclose the need for an accommodation for her allergies during the application process.

Shortly thereafter, and despite RTG's accommodation efforts, Holste sued RTG, asserting failure to accommodate and retaliation claims under the Americans with Disabilities Act Amendments Act (ADA).  (Doc. 1 at 13-19).[2]  She also alleges that RTG subjected her to a hostile work environment.  (*Id.* at 19-21).

RTG is entitled to summary judgment on all of Holste's claims.  Her discrimination and retaliation claims fail because she cannot establish a *prima facie* case of either—

---

[2]  All page numbers associated with "Doc." citations are those imprinted by the Court's docketing software.

discrimination because RTG reasonably accommodated Holste's allergies, and retaliation because she suffered no adverse employment actions. Indeed, Holste's employment ended not because of anything RTG did, but because she voluntarily quit.

Her hostile work environment claim—which the Eleventh Circuit has never recognized—fares no better. Holste never raised such a claim in any EEOC charge and thus failed to exhaust available administrative remedies prior to bringing suit. Even if she had, RTG never harassed Holste or endeavored to make the workplace uncomfortable for her. Instead, RTG did everything in its power to ensure Holste was safe while on the job.

Because all of Holste's claims fail as a matter of law and undisputed fact, RTG respectfully requests that the Court grant its Motion for Summary Judgment and dismiss this case with prejudice.

## STATEMENT OF FACTS

### A.    RTG is an Equal Opportunity Employer

RTG maintains strict anti-discrimination, anti-harassment, and anti-retaliation policies to create an inclusive company culture. (Statement of Undisputed Material Facts ("SUMF") at ¶ 1). RTG's employee handbook details its Equal Employment Opportunity policy for those with disabilities, as well as a policy for how employees request accommodations. (*See* SUMF at ¶ 3); *id.* at ¶ 5. Working in conjunction with those supportive policies are RTG's "zero tolerance" anti-harassment policy and disciplinary policy. (SUMF at ¶¶ 5, 7). Both help ensure a work environment free from

discrimination, harassment, and retaliation.  Holste signed a form acknowledging her receipt of all of these policies.  (SUMF at ¶ 8).

### B.    RTG Hires Holste

Holste began as a sales associate in the Savannah store in September 2018.  (SUMF at ¶ 10).  At that time, the Savannah store used a multi-purpose cleaner and several other products as cleaning chemicals.  (SUMF at ¶ 17).  Holste never expressed any issues with those chemicals to anyone at RTG from September 2018 until July 2019 despite claiming to have suffered from allergies since at least 2012.  (SUMF at ¶¶ 18-19).

On or about July 9, 2019, Holste informed RTG for the first time that she had a medical condition called Allergic Contact Dermatitis which may have been aggravated at work.  (SUMF at ¶ 20).  It was not until July 25, 2019, however, that Holste expressed concern that the store's cleaning products might be triggering her allergies, something she had never mentioned before despite working around those chemicals for the ten previous months.  (SUMF at ¶ 22).  That same day, Holste told RTG's workplace safety nurse, Sherri Schaber, that she would provide a list of her allergens.  (SUMF at ¶¶ 24).  Given that only some chemicals triggered her allergies, Holste admits it was complicated to ascertain everything she may be allergic to.  (SUMF at ¶ 25).

### C.    RTG Accommodates Holste

July 25, 2019 also saw the beginning of RTG's interactive and ongoing conversation with Holste about accommodating her allergies.  As the first step, Schaber asked Holste to take the Savannah store's Material Safety Data Sheets (documents that detail the

composition and potential dangers of all chemicals in the store) to her doctor to identify which chemicals in the store posed risks.  (SUMF at ¶ 26).

After Holste did that, she identified to Schaber and RTG's HR manager in charge of the Savannah store, Anna Yazbeck, a specific sanitizing spray that would be dangerous to her.  (SUMF at ¶¶ 28, 29).  She did not single out any other in-store chemicals as dangerous at that time.  (SUMF at ¶ 29).

Holste eventually provided Schaber with a printout that listed a variety of chemicals, metals, and medicines that triggered Holste's dermatitis, including gold, zinc, and a variety of other common metals and substances.  (SUMF at ¶ 33).  Schaber then asked Ms. Alvarez, RTG's head of purchasing, for her help in finding replacements for cleaners Holste identified as harmful.  (SUMF at ¶ 31).

Alvarez and her team are responsible for procuring supplies for all RTG stores. (SUMF at ¶¶ 12, 13, 14).  To do that, and to contain supply costs, RTG has national contracts with suppliers who provide all stores across the country with the same cleaning products through the same vendor.  (SUMF at ¶ 12, 14).  Individual RTG stores do not have the ability to directly contact vendors and have little control over what products are supplied to them.  (SUMF at ¶ 15, 16, 17).  The stores instead must filter their requests through purchasing.  (SUMF at ¶ 14).  For cleaning products in particular during Holste's time with the company, stores had limited options.  (SUMF at ¶¶ 16, 17).

Notwithstanding RTG's purchasing policies, the company did not wait for Alvarez to locate replacement cleaners before making changes to accommodate Holste. (SUMF at ¶¶ 26, 27).  It did not even wait for Holste to formally submit an

accommodation request form, which she eventually did.  (SUMF at ¶ 51).  Instead, by July 27, 2019, two days before Holste submitted an accommodation form, the porters in the Savannah store were cleaning with vinegar and water instead of the cleaners that Holste and her doctor identified as posing a risk of allergic reaction.  (SUMF at ¶¶ 27, 36).  Store manager Wayne Mizell also instructed the porters to stop using the cleaner and threw  away all the cleaners that he could find in the store to avoid their accidental use.  (SUMF at ¶¶ 36, 37).

Three days after Holste notified RTG of what she thought caused her disability, and one day after Mizell threw away what he thought were all cans of the spray, one porter (who had not been at work the day Mizell instructed everyone to stop using the cleaners) found a single can of disinfecting spray that had escaped Mizell's previous search of the store, and he proceeded to use it while Holste was in the store.  (SUMF at ¶¶ 42-43).  When he became aware of what happened, Mizell immediately "told [the porter] not to use this spray any longer and asked him to collect all of the spray cans and turn them into the office . . . ."  (SUMF at ¶ 46).  Mizell then personally disposed of the spray can and searched the entire store to make sure that no additional cans remained.  (SUMF at ¶¶ 46, 48).

Throughout August and September 2019, RTG continued trying to find a cleaner that would not aggravate Holste's allergies.  (SUMF at ¶ 56).  To that end, Alvarez worked with RTG's national supplier, Staples, to find alternative cleaning products.  (SUMF at ¶ 56).  Staples suggested a Purell product, and RTG ordered one bottle to test.  (SUMF at ¶ 58).  When Holste expressed hesitation about whether the new cleaner was safe for her,

RTG worked with Staples to determine exactly what chemicals the cleaner contained and provided Holste with contact information for a supplier representative to allow her to communicate her concerns directly with the supplier. (SUMF at ¶¶ 63, 64).

RTG did not stop there. Ken Rickles, the regional manager in charge of the Savannah store, coordinated a time for a supplier representative to personally visit the RTG Savannah location and meet with Holste in person. (SUMF at ¶ 65). The rep, who was chosen for his knowledge concerning allergic reactions to cleaning products, reviewed the list of chemicals to which Holste was allergic, and discussed with her product information and alternatives. (SUMF at ¶¶ 65, 66). Together, the rep and Holste determined that a different Purell cleaner, Purell Healthcare Spray, would be safe. (SUMF at ¶ 66). RTG then began ordering and using this product in late October 2019. (SUMF at ¶ 66, 67).

Shortly before the Purell Healthcare Spray was delivered, RTG began a project to install new flooring in the Savannah store. (SUMF at ¶ 59). Holste indicated she was allergic to fumes from the epoxy resin that would be used during the project. (SUMF at ¶ 59). Stopping the re-flooring was not a viable accommodation, but RTG instead allowed Holste to take a leave of absence while the flooring project was completed. (SUMF at ¶ 60). Because Holste's already planned to use paid time off in early October 2019, her period of leave stretched a mere two days. (*Id*.)

At no point from July 27, 2019 (less than a week after Holste identified cleaners at work as a possible cause of her allergic reaction) until late October 2019 (when the Purell Healthcare Spray arrived) did RTG employees intentionally use any cleaners that Holste

and her doctor said were problematic.  (SUMF at ¶¶ 87, 88).  In other words, from July 2019 to the onset of COVID (more on that below), the Savannah store was cleaned with only vinegar and water and a spray that Holste herself selected as acceptable.  (*Id.*)

### D.    Holste's Misconduct and Violation of RTG's Policies

At the same time as RTG and Holste engaged in their ongoing dialogue about how to accommodate her allergies, Holste was involved in two incidents that led to responses by RTG.

Incident One.  On September 10, 2019—in the middle of a period during which, according to Holste, she endured a hostile work environment—Holste complained that her co-worker Kianis Smalls stole a sale from her.  (SUMF at ¶ 69-70).  Holste believed that she should be credited with the sale, and complained to both Mizell and Assistant Manager Robert Beasley about the incident.  (SUMF at ¶ 70).  RTG investigated, agreed with Holste's version of events and desired outcome, and credited Holste with the sale. (SUMF at ¶ 71).  Holste was reminded not to discuss disputes on the sales floor and to remain professional in front of customers.  (*Id.*)

Incident Two.  Just over a week after the incident with Smalls, Holste attended a mandatory training session in Charlotte, North Carolina.  (SUMF at ¶ 72).  Holste and several co-workers traveled together to that training in one of the other employee's cars. (SUMF at ¶¶ 72, 73).  Holste did not drive.  (SUMF at ¶  73).  Upon their return, Holste sought reimbursement for mileage driven despite her car not being used and not driving herself.  (SUMF at ¶ 73).

In response, Yazbeck told Holste that only those whose cars are driven can receive mileage reimbursement. (SUMF at ¶ 74). Unable to understand that required connection, Holste, according to two witnesses, "attacked" Vitiello verbally in front of other associates in the office and in front of customers when he asked for receipts to prove the expenses for which she sought reimbursement. (SUMF at ¶¶ 75, 76). Two RTG employees who witnessed the incident submitted statements. Desaree Jones-Williams stated that Holste was "very rude" despite Mr. Vitiello's calmness. (SUMF at ¶ 77). Gary Reid corroborated that account, indicating that Holste spoke to Vitiello in a "very loud voice" and was "rude and unprofessional." (SUMF at ¶ 78). According to Reid, Holste was "demanding" payment for expenses, "would not let it go," and continued to "shame Chris [Vitiello]." (SUMF at ¶ 78). Reid also indicated there was a customer present during this incident who overheard Holste and felt uncomfortable. (SUMF at ¶ 78).

Rickles, Yazbeck, and others at RTG deliberated on how to address what happened. (SUMF at ¶ 79). Ultimately they decided that Holste's behavior had to be addressed formally because it violated RTG policies. (SUMF at ¶¶ 79). Rather than terminate Holste, reduce her hours, or change her schedule, Holste received a "final written warning." (SUMF at ¶¶ 80, 81). That piece of paper was placed in Holste's personnel file, but nothing more happened as a result. (SUMF at ¶ 81). Holste remained an RTG employee, she continued to receive her same hourly draw rate and commissions, and she worked just as many hours as before. (SUMF at ¶ 81).

E.      **Holste Files an EEOC Charge of Discrimination**

Once again feeling aggrieved, Holste filed an EEOC charge less than one week after receiving the final written warning.  (SUMF at ¶ 82).  In it, she accused RTG of discrimination and retaliation due to her disability.  (SUMF at ¶ 82).  She did *not* include any allegations relating to her work environment, much less any alleged hostility she suffered there. (SUMF at ¶ 82).

An EEOC investigator interviewed Mizell, Rickles, and Vitiello, and reviewed documents from the company and Holste.  (SUMF at ¶ 83).  Even after a fulsome investigation, the EEOC was unable to conclude that RTG discriminated or retaliated against Holste, or engaged in any other statutory violations.  (SUMF at ¶ 84).

F.      **The COVID-19 Pandemic Strikes**

The pandemic changed life beginning in late February 2020.  Toilet paper disappeared from stores.  People hoarded canned food out of fear.  And seemingly everyone hunted for hand sanitizer, sanitizing wipes, and bleach in an effort to disinfect every surface.  That included RTG.

As a result of those shortages, many cleaning supplies became unavailable. (SUMF at ¶ 86).  Among them was the Purell Healthcare Spray that RTG used to accommodate Holste's allergies.  (SUMF at ¶ 88).  Once the pandemic struck, RTG could no longer order that product for the Savannah store.  (SUMF at ¶ 88).  In fact, it remained unavailable for the remainder of Holste's tenure with RTG.  (SUMF at ¶¶ 88, 91).

At first, RTG went back to water and vinegar for cleaning the Savannah store. (SUMF at ¶ 88).  Unsurprisingly, the cleanliness of the store became an issue.  (SUMF at

¶¶ 89, 94).  On March 20, 2020, RTG received a complaint from an employee about the store's cleanliness.  (SUMF at ¶ 94).  The salesperson expressed concern about the lack of cleaning agents being used to sanitize surfaces despite the presence of COVID-19 in the community.  (SUMF at ¶ 94).  She was particularly concerned given the volume of customers entering and exiting the store.  (SUMF at ¶ 94).  Her concerns were shared by other employees and store management.  (SUMF at ¶¶ 89, 94).

Employee concerns, the need to protect both customers and employees, and local sanitation requirements led RTG to conclude that it had no choice but to begin using cleaning agents that worked better against the virus than vinegar and water.  (SUMF at ¶¶ 101, 102).  Supply constraints limited the options available.  (SUMF at ¶ 88).  Needing to sanitize the store urgently but with limited options available from the supply constraints, RTG relied on the cleaners that its national supplier had available.  (SUMF at ¶ 101).  Those happened to be the cleaners that the Savannah store used from September 2018 to July 2019 when Holste requested an accommodation.  (SUMF at ¶ 103).

### G.    Holste Voluntarily Resigns from RTG

Like other businesses across the country, the pandemic forced RTG's Savannah store to temporarily close its doors.  While the store was closed, Holste and the other sales associates were furloughed and still receiving pay.  (SUMF at ¶ 98).

Around April of 2020, the Savannah store reopened and work became available.  (SUMF at ¶ 99).  Mizell began reaching out to associates to see who felt comfortable returning to work.  (SUMF at ¶¶ 99, 100).  But RTG did not force anyone to come back or

11

else lose their jobs.  (SUMF at ¶ 100).  Only those willing to return did so.  (SUMF at ¶ 100).

As part of his outreach, Mizell called Holste several times to ask if she wanted to return.  (SUMF at ¶ 99).  He acknowledged that the store was being cleaned with the chemicals that Holste objected to as a result of supply constraints on the Purell Healthcare Spray.  (SUMF at ¶ 103).  Holste chose not to return to work. (SUMF at ¶ 104).

Holste asked Yazbeck if she could transition to a remote customer service position, but no such positions were available.  (SUMF at ¶ 106).  Because she was unwilling to return to work, RTG continued to accommodate Holste by placing her on unpaid leave. (SUMF at ¶ 104).  On July 10, 2020, less than a month after applying for employment with an RTG competitor (SUMF at ¶ 108), Holste voluntarily resigned from her position with RTG.  (SUMF at ¶ 107).  About four months later, she filed this suit.  (Doc. 1).

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted whenever the pleadings, depositions and affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The mere existence of one or more factual disputes between the parties will not defeat a motion for summary judgment if the disputed issues are not material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  For an issue of fact to be material, it must be outcome determinative.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-88 (1986).

## ARGUMENT

No genuine disputes of material fact exist that merit trial on any of Holste's claims. Her discrimination claim fails because RTG accommodated her allergies and because COVID-19 eventually made Holste's preferred accommodation an undue hardship. Her retaliation claim fails because she suffered no adverse employment action. And her hostile work environment claim fails because Holste failed to exhaust administrative remedies and did not, as a matter of law, work in a hostile space.

### A.     Holste's Failure to Accommodate Claim Fails

#### 1.     *RTG Accommodated Holste's Disability*

Holste alleges that RTG discriminated against her because of disability by denying her a reasonable accommodation that would allow her to work without being exposed to chemicals that triggered her allergies. (Doc. 1 at 13-15). That claim fails because undisputed facts demonstrate that RTG provided her with a reasonable accommodation.

The ADA prohibits disability discrimination, which includes "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified [employee] . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). "The burden of identifying an accommodation that would allow a qualified individual to perform the job rests with" the employee. *Maddox v. Ala. Dep't of Transp.*, No. 2:15-CV-00312-MHH, 2018 WL 3241212, at *2 (N.D. Ala. July 3, 2018). But not any accommodation will do—it must be *reasonable* under the specific circumstances present. *Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998) (holding that employers are

not "required to accommodate an employee in any manner in which that employee desires"). Put another way, "under the ADA a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation." *Maddox*, 2018 WL 3241212, at *2.

RTG does not dispute that Holste is a qualified individual with a disability. Even so, her failure to accommodate claim cannot succeed because RTG *did* reasonably accommodate Holste by:

(1)    engaging in an interactive conversation to identify harmful chemicals and suitable replacements;

(2)    using indisputably harmless alternatives until an alternative could be found;

(3)    procuring a suitable alternative; and

(4)    modifying her work schedule to avoid her coming into contact with harmful chemicals.

(*See* SUMF at ¶¶ 24, 27, 30-34, 39, 47, 52, 53, 60, 66, 68).

Reasonable accommodations can, under the right circumstances, include a wide range of job modifications, including modified work schedules and acquisition or modification of equipment. *See* 42 U.S.C. § 12111(9)(B); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001). In *Cheese v. Navy Federal Credit Union*, for example, the employer reasonably accommodated its employee's hypersensitivity to smells by requiring other employees not to use sprays in the bathroom the plaintiff used and by arranging office cleaning to prevent the plaintiff from contacting irritating chemicals. 2020 WL 7485361, at *5 (N.D. Fla. Aug. 7, 2020). And the Alabama DOT in *Maddox*

accommodated its employee's allergies to dust and asphalt by allowing her to leave work whenever she had breathing problems and installing an air purifier in her office, among other things.  2018 WL 3241212, at *2.  The DOT was not, however, required to "create an environment completely free of fumes, dust, mold, or other allergens to accommodate an employee's health condition."  *Id.*

RTG here acted with the same effort to accommodate Holste that the Alabama DOT showed in *Maddox* and which justified summary judgment in that case.  From the very beginning, RTG engaged in an interactive process with Holste to determine which chemicals she was allergic to, and which chemicals would be safe.  (SUMF at ¶¶ 26-34).  Rather than risk incorrect identification of Holste's allergens though, RTG relied on Holste and her doctor to say what chemicals she could tolerate and which needed to go.  (SUMF at ¶¶ 26-34, 39).

RTG did not wait to hear back from Holste and her doctor.  Instead, in addition to the steps identified above that RTG had already taken, the company:

    (5)    proactively disposed of all cleaning supplies in the store two days after Holste suggested that chemicals at work might be causing her health problems;

    (6)    within that same time frame switched to using water and vinegar to clean the store; and

    (7)    made all store porters aware of Holste's condition to ensure harmful chemicals would not be used.

(SUMF at ¶¶ 27, 36, 37, 45, 46).

And after receiving information from Holste's doctor, RTG continued to engage in the interactive process by:

(8)     working with suppliers to find products safe for Holste;

(9)     allowing Holste to take leaves of absence when her allergies bothered her;[3]

(10)    rearranging her work schedule when major store cleanings were unavoidable;

(11)    connecting Holste with RTG's supplier so they could communicate directly to find suitable cleaning products;

(12)    coordinating with the supplier representative for an on-site visit to speak to Holste in person about suitable products; and

(13)    finding suitable alternatives and using those until they were no longer available due to the COVID-19 pandemic.

(SUMF at ¶¶ 52, 60, 64, 65, 66, 67, 68, 88).

The ADA does not require more from RTG.  *See Maddox*, 2018 WL 3241212, at *2 (the ADA "does not require an employer to create an environment completely free of . . . allergens to accommodate an employee's health condition").

---

[3] The Eleventh Circuit has consistently held that a leave of absence is a reasonable accommodation if it would allow an employee to continue to work in the immediate future. *See Billups v. Emerald Coast Utilities Auth.*, 714 F. App'x 929, 935 (11th Cir. 2017) (*citing Wood v. Green*, 323 F.3d 1309, 1313 (11th Cir. 2003)).

### 2. The Covid-19 Pandemic Rendered Holste's Accommodations An Undue Hardship

The ADA requires accommodations reasonable under the circumstances and "the employer's existing policies," *Terrell*, 132 F.3d at 627, not any accommodation that an employee requests. *See Maddox*, 2018 WL 3241212, at *2. Those that cause an undue burden need not be implemented. *See Frazier-White v. Gee*, 818 F.3d 1249, 1255-56 (11th Cir. 2016). Because of COVID-19, accommodating Holste's allergies with cleaners crossed the threshold from reasonable to undue burden.

The intersection of two undisputed facts crystallizes why using particular cleaners to accommodate Holste became untenable. First, the existing cleaner that successfully accommodated Holste from late October 2019 until the pandemic struck, as well as almost all other sanitizing wipes, sprays, and liquids, became unavailable. (SUMF at ¶ 88). Common household bleach disappeared from store shelves. Rubbing alcohol disappeared. Even soaps became hard, if not impossible, to find. In other words, supply issues meant that the universe of available cleaners shrank precipitously. (SUMF at ¶ 86).

Second, the existence of a new and deadly disease required RTG to implement extraordinary measures to ensure that its stores were safe for everyone, not just Holste; RTG was responsible for the safety of her coworkers and its customers as well. To ensure the safety of its employees and the public, and to comply with local emergency measures requiring deep cleaning, RTG had to use cleaners that it could be sure would neutralize any pathogens on surfaces. (SUMF at ¶¶ 90, 96, 101).

The combination of limited supply and the need for a cleaner that would kill COVID shrank even further the range of options for cleaners. The range, in fact, effectively became one option—the industrial cleaner that RTG used prior to Holste's complaints in July 2019 (the same cleaner that caused Holste no allergic reactions from her start date in September 2018 until July 2019). (SUMF at ¶ 103). RTG could obtain that cleaner (it had no access to others through its existing purchasing relationships) and that cleaner killed COVID. (SUMF at ¶ 96). Cleaners that weren't available or couldn't kill COVID were not reasonable options once the pandemic struck.

What actually happened in Savannah in March 2020 illustrates that point well. After the Purell Healthcare Spray disappeared, RTG resumed cleaning with vinegar and water. (SUMF at ¶ 88). Employees brought in their own cleaners and sanitizers as well, but Mizell threw them away because of Holste's allergies. (SUMF at ¶¶ 92-93). It did not take long before another employee complained about the store's cleanliness in the midst of the pandemic. (SUMF at ¶ 94). She felt, justifiably so, that the lack of cleaning supplies or disinfectants being used—a direct result of RTG accommodating Holste's allergies— put her life at risk. (SUMF at ¶ 94). Ultimately, RTG had no choice but use chemicals that Holste believed would harm her—but that, oddly enough, had not caused her any difficulties from September 2018 until July 2019—or else risk the health and safety of other employees and the general public.

Once Holste's preferred accommodation became unreasonable, RTG looked for other options. When the Savannah store reopened after the initial lockdown in March and April 2020, Mizell offered Holste multiple times the opportunity to return to work.

18

(SUMF at ¶ 99).  She refused.  (SUMF at ¶ 104).  RTG offered her unpaid leave.  (SUMF at ¶ 104).  She refused that accommodation as well, [4] and quit on July 10, 2020.  (SUMF at ¶ 107).

The ADA obligated RTG to provide Holste *reasonable* accommodations.  Under the pandemic created circumstances of supply constraints and enhanced sanitation needs, accommodating Holste by using particular cleaners became an undue burden.  Her disability discrimination claim, therefore, fails as a matter of law and should be dismissed with prejudice.

### C.    Holste's Retaliation Claims Fail Because She Suffered No Adverse Employment Action

Holste's EEOC charge and complaint suggest that her retaliation claim rests on unspecified harassment and the write-up she received in September 2019.  (*See* Doc. 1 at 16; SUMF at ¶ 80).  Neither can support her claim.

ADA retaliation claims require a plaintiff to prove that (1) she engaged in statutorily protected activity; (2) she suffered an adverse action; and (3) there was a causal link between the adverse action and her protected activity.  *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001).  Holste's claim fails because she suffered no adverse actions.

Employment actions qualify as adverse only if they result in some tangible, negative effect on the plaintiff's employment.  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249,

---

[4]   *See Billups*, 714 F. App'x at 935 (holding that a leave of absence is a reasonable accommodation where it would allow an employee to return to work in the immediate future).

1261 (11th Cir. 2001).  "[A]n employee" must, in other words, demonstrate that she suffered "a serious and material change in the terms, conditions, or privileges of employment." *Id.*

Holste never suffered any change in the terms or conditions or her employment, much less a serious or material one, during her time with RTG.  In September 2019, she received a final written warning related to her unprofessional conduct toward an assistant manager.  (SUMF at ¶ 80).  But that warning resulted in no change to her employment.  (SUMF at ¶ 81).  It documented the incident and was placed in Holste's personnel file.  That's it.  Her pay remained the same.  Her hours remained the same.  Her schedule remained the same.  Holste herself admits as much.  (SUMF at ¶ 81).  Her final written warning thus cannot qualify as an adverse employment action.  *See Manley v. DeKalb Cty., Georgia,* 587 F. App'x 507, 513 (11th Cir. 2014) (holding that although Plaintiff subjectively believed that two write-ups were retaliatory, there was nothing in the record to suggest she suffered a materially adverse employment action where Plaintiff received no reduction in pay, benefits, or responsibilities); *Kubiak v. S.W. Cowboy, Inc.,* 164 F. Supp. 3d 1344 (M.D. Fla. 2016) (holding that a write-up alone, without any indication that it was accompanied by a reduction in pay, benefits, responsibilities, or some other adverse effect, is insufficient to establish an adverse employment action).

Holste's nebulous allegation that RTG "harass[ed] her with false allegations of policy violations" likewise falls short of an adverse action.  (Doc. 1 at 16).  For one, the record contains no suggestion of such harassment.  The only incident approximating "allegations of policy violations" relates to the final written warning described above.

(SUMF at ¶ 80).  Whether or not Holste in fact violated an RTG policy—she did, but the Court need not make that determination for purposes of this Motion—that incident comes nowhere close to "harassment" or an adverse employment action.

In a related vein, nothing suggests that any such "harassment" led to any change in Holste's employment.  From her hiring in September 2018 to the day she quit in July 2020, Holste remained an RTG salesperson, never had her pay reduced, never lost commissions because of any "harassment" (in fact, she *gained* a commission because of her complaint about Smalls), never saw her schedule reduced, and never saw her responsibilities change.  (SUMF at ¶¶ 71, 81).

Holste also suggests that she was "driv[en] from the workplace because she sought an accommodation."  (Doc. 1 at 16).  Certainly termination qualifies as an adverse action.  So too does constructive discharge.  But Holste suffered neither.

No one contends that RTG terminated Holste.  She unambiguously resigned on July 10, 2020, about a week after she accepted a new job with an RTG competitor without informing her new employer of her allergies during the application process.  (SUMF at ¶¶ 107, 108).  That resignation does not qualify as a constructive discharge, or her being "driv[en] from the workplace."

"To prove a constructive discharge under the ADA, a plaintiff must demonstrate that working conditions were so intolerable that a reasonable person in her position would have been compelled to resign."  *Phillips v. Harbor Venice Mgmt., LLC*, 2020 WL 2735201, at *5 (M.D. Fla. May 26, 2020) (quoting *Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1283–84 (11th Cir. 1999)).  Holste must also show that RTG "intentionally rendered" her

work conditions "so intolerable" because of her allergies or accommodations requests that she "was compelled to quit involuntarily."  *Id.* (citing *Henson v. City of Dundee*, 682 F.2d 897, 907 (11th Cir. 1982)).

Any suggestion of constructive discharge fails at every level.  From September 2019 (when she engaged in protected activity that allegedly triggered retaliatory harassment that forced her to quit ten months later) until the pandemic struck in March 2020, Holste continued working at RTG without issue or complaint on her part.  (SUMF at ¶ 67).   She even took an extended medical leave of absence during that time for surgery, coming back to her position in early February 2020 and picking up where she left off.  (SUMF at ¶ 81).

Holste's delay in quitting until ten months after the alleged (but unsupported) harassment began only reinforces the voluntary nature of her separation from RTG. Indeed, the timing and circumstances of her resignation suggest that she waited to quit until she found another job (SUMF at ¶ 107, 108)—a financially smart thing to do, to be sure, but also conduct that belies a situation "so intolerable" that she "was compelled to quit involuntarily."  *Id.*   That is a far cry from the objectively intolerable working conditions necessary to show a constructive discharge.  *See Poole v. Country Club*, 129 F.3d 551, 552 (11th Cir. 1997) (holding that constructive discharge claim survived summary judgment where the plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers").

At bottom, Holste never suffered any adverse employment action during her time at RTG.  Her retaliation claim fails as a matter of law and should be dismissed.

**D.      RTG Is Entitled To Summary Judgment On Holste's Hostile Work Environment Claim**

Holste's hostile work environment claim fails for two reasons.  First, she failed to exhaust administrative remedies by omitting the claim from her charge of discrimination.  That failure precludes pursuit of the claim in federal court.  And even if she had exhausted administrative avenues first, her claim still fails because she cannot show that she suffered through a hostile work environment.

1.      *Holste failed to exhaust administrative remedies*

Prior to filing an ADA claim, "a plaintiff first must file a charge of discrimination with the EEOC."  *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004).  Any subsequent judicial proceeding "is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000).  When an EEOC charge raises claims of discrimination and retaliation, but not hostile work environment, courts in this circuit regularly dismiss for failure to exhaust.  *See, e.g.*, *Ramon v. AT&T Broadband*, 195 F. App'x 860, 866 (11th Cir. 2006) (affirming summary judgment for employer where EEOC charge lacked allegations "that would allow us to conclude that she intended to have the EEOC investigate the workplace for a hostile work environment").

Holste's EEOC charge alleged that she made RTG aware of her disability and that RTG failed to provide reasonable accommodations.  (SUMF at ¶ 82).  It says that she complained to Mizell and HR and received a final warning the day after one of her complaints.  (SUMF at ¶ 82).  The last statement Holste made in the charge is "I believe I

have been discriminated and retaliated against due to my disability." (SUMF at ¶ 82). Nowhere does she even obliquely reference any allegations that suggest an intent to have the EEOC investigate a hostile work environment. (SUMF at ¶ 82). That the EEOC subsequently did not conduct such an investigation underscores Holste's failure to exhaust. (SUMF at ¶ 84). This reason alone warrants dismissal of her claim.

2.   *Holste cannot establish a prima facie hostile work environment claim*

Even if Holste exhausted administrative remedies as to her hostile work environment claim, she still fails to establish a prima facie case. To do that, assuming such a claim even exists,[5] she must prove that the harassment she suffered was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment. *Arrington v. Ala. Power Co.*, 769 F. App'x 741, 747 (11th Cir. 2019). Teasing, offhand comments, and isolated incidents (unless extreme) will not amount to discriminatory changes in the terms and conditions of employment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

The conduct about which Holste complains does not qualify as severe and pervasive. At worst, Holste found cleaning products in the store after she requested their removal and after Mizell thought he had thrown them away; a porter sprayed the store with the cleaning product while Holste was present; Holste found cleaning wipes near her business cards; and Holste received a final written warning (for conduct unrelated to

---

[5] The Eleventh Circuit has never affirmatively recognized a hostile work environment claim under the ADA. *See Barneman v. Int'l Longshoreman Ass'n Loc. 1423*, 840 F. App'x 468, 481 n.6 (11th Cir. 2021).

her allergies).  (SUMF at ¶¶ 38, 42, 80, 95).  In isolation or taken together, those incidents do not demonstrate a severe and pervasive pattern of behavior and thus cannot support Holste's hostile work environment claim.  *See Mont-Ros v. City of W. Miami*, 111 F. Supp. 2d 1338, 1362 (S.D. Fla. 2000) (harassment because of disability, demeaning questions, and being followed around so defendants could see plaintiff's disability unfold did not amount to "severe and or egregious" conduct); *Rodriguez v. Loctite Puerto Rico, Inc.*, 967 F.Supp. 653, 665–666 (D.P.R. 1997) (questioning severity of employee's medical condition, insulting employee's smile and intimating it could get employee fired, preventing photographer from delivering picture to employee, suggesting employee had taken another employee's turkey, and giving employee unsatisfactory evaluation, were insufficiently severe or pervasive to avoid summary judgment).

## CONCLUSION

For these reasons, RTG respectfully requests that the Court grant its motion and enter summary judgment in its favor on all of Holste's claims.

Respectfully Submitted,

*/s/ Lennon B. Haas*
Daniel P. Hart
dhart@seyfarth.com
Georgia Bar No. 141679
Lennon B. Haas
lhaas@seyfarth.com
Georgia Bar No. 158533
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E., Suite 2500
Atlanta, GA 30309-3958
Telephone: (404) 885-1500
Facsimile: (404) 892-7056
*Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| **CHARLENE A. HOLSTE** ) | |
| ) | |
|     **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 4:20-CV-00276** |
| ) | |
| **RTG FURNITURE CORP. OF** ) | |
| **GEORGIA,** ) | |
| ) | |
|     **Defendant.** ) | |

_____

## CERTIFICATE OF SERVICE

I certify that on November 24, 2021, I filed **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will automatically send electronic notification of such filing to the following attorney of record:

S. Wesley Woolf, Esq.
WOOLF LAW FIRM
408 East Bay Street
Savannah, Georgia 31401


*/s/ Lennon B. Haas*
Lennon B. Haas
lhaas@seyfarth.com

26