IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


CHARLENE A. HOLSTE,

  Plaintiff,

   v.

RTG FURNITURE CORP. OF GEORGIA,

  Defendant.

CIVIL ACTION NO.: 4:20-cv-276


**O R D E R**

This action arises out of the disability discrimination Plaintiff Charlene Holste allegedly suffered during her employment at Defendant RTG Furniture Corporation of Georgia. (See doc. 1.) Plaintiff sued Defendant for violating the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.* ("ADA" or "ADAAA"). (Id. at pp. 13–21.) Specifically, Plaintiff alleges that Defendant failed to provide a reasonable accommodation for her allergic contact dermatitis, retaliated against her, interfered with the exercise of her ADA rights, and subjected her to a hostile work environment. (See id.) Presently before the Court is Defendant's Motion for Summary Judgment. (Doc. 26.) The motion is fully briefed by the parties. (See docs. 26, 35, 37.) For the following reasons, the Court **GRANTS in part and DENIES in part** Defendant's Motion for Summary Judgment. (Doc. 26.)

**BACKGROUND**

I.    **Factual Background**

A.    **Plaintiff's Disability**

Plaintiff Charlene Holste was first diagnosed with allergic contact dermatitis in 2012. (Doc. 33-1, p. 7.)  As a result of this condition, Holste suffers skin rashes, swelling, and other irritations when she encounters certain chemicals.  (See doc. 26-5, pp. 37–39.)  Furthermore, because the chemicals to which Plaintiff is allergic often "go by different names," it is "complicated [for Plaintiff] to figure out what [she is] allergic to or not allergic to."  (Doc. 33-3, p. 13; see doc. 33-1, p. 10.)  Prior to her employment with Defendant, Plaintiff had not suffered from an allergic reaction in six years.  (See Doc. 33-3, p. 24.)  Nonetheless, due to her condition, Plaintiff kept a list of specific chemicals to which she was allergic (the "List").  (See id.)

B.    **Plaintiff's Employment at Defendant**

In August 2018, Wayne Mizell, the store manager of Defendant's Rooms-to-Go store in Savannah, Georgia, (the "Store") interviewed and hired Plaintiff to work as a sales associate.  (Doc. 33-1, p. 4.)  Plaintiff began work in September 2018.  (Id. at p. 5.)  Plaintiff did not discuss her allergies with Mizell or anyone else at the Store during the interview process.  (Doc. 33-3, p. 24.)  Rather, Plaintiff "had a discussion with . . . Mizell after being hired just to let him know that . . . [she] ha[d] allergies to specific chemicals."  (Id.)  During her discussion with Mizell, Plaintiff asked him "what was the proper way . . . to have the [L]ist kept in the [S]tore."  (Id.)  Mizell denied Plaintiff's request, responding that "[u]nless there was an incident, it was not important to have the [L]ist in the [S]tore."  (Id.)

2

C.      **Plaintiff's July 2019 Allergic Reaction**

1.      **Plaintiff suffered an allergic reaction at the Store in July 2019.**

According to Plaintiff's testimony, on July 7, 2019, while working at the Store, she suffered an allergic reaction, which caused a "very painful and swollen" blister to appear on her arm. (Doc. 33-3, pp. 17–18, 20–25.)  Plaintiff alerted Mizell, and she left work to go to an urgent care clinic. (Id. at p. 24.)  At that time, the urgent care clinic could not determine the cause of the blister but gave Plaintiff medication and told her to "keep an[] eye on the area."  (Id. at p. 18.)  Plaintiff returned to work the same day and informed Mizell that the urgent care clinic is "not sure what it is yet at this time, but it's a possibility it could be a reaction to something."  (Id. at p. 25.)  By July 9, 2019, the blister on Plaintiff's harm had worsened, causing Plaintiff to visit several doctors on multiple occasions over the next couple weeks.  (Id. at p. 20; see doc. 33-1, p. 8 (Plaintiff admitting that she "received follow-up medical treatment from other doctors").)  Among these doctor's visits was an appointment with a dermatologist on July 26, 2019, during which the dermatologist informed Plaintiff that she believed Plaintiff's allergic reaction was caused by a chemical at the Store.  (Doc. 33-3, pp. 18, 22–23; see doc. 26-13, p. 12 (dermatologist's note stating that Plaintiff "may be reacting to soap used at work").)

2.      **Defendant attempted to identify and remove from the Store the substance that caused Plaintiff's July 2019 allergic reaction.**

After Plaintiff's July 2019 allergic reaction, Defendant attempted to remove cleaning products harmful to Plaintiff from the Store and replace them with cleaners that did not trigger Plaintiff's allergy.  (See doc. 33-1, p. 15.)  Plaintiff was supposed to identify the products to which she was allergic, and Defendant would subsequently remove those products from the Store.  (See id.; doc. 26-6, p. 135.)   Furthermore, once Plaintiff identified those products, Defendant's

purchasing department "knew not to fulfill . . . [or] make any requests for those products." (Doc. 26-9, p. 13.)

For example, around July 10, 2019, (during the same timeframe Plaintiff was attending several doctor's appointments), Plaintiff contacted Defendant's human resources department ("HR") and Sherri Schaber, Defendant's company nurse. (See doc. 33-1, pp. 9–10; see also doc. 33-3, p. 26; doc. 33-14, pp. 4–5.) Nurse Schaber instructed Plaintiff to fax her "allergy paperwork" (i.e., the list of chemicals to which Plaintiff was allergic) to her and to contact HR for an "accommodation request form." (Doc. 33-14, p. 5.) Plaintiff testified that she completed the accommodation request form and gave it to Mizell, but Mizell refused to sign the form and did not return it. (Doc. 33-3, p. 27.) On July 25, 2019, Plaintiff sent Nurse Schaber a list of her "primary allergens." (Doc. 26-3, p. 2; doc. 33-8, pp. 108–12; see doc. 33-1, pp. 9–10.) Nurse Schaber instructed Plaintiff to take the Store's Material Safety Data Sheets—documents that list the chemicals used in the Store—to her dermatologist so that—according to Nurse Schaber—Plaintiff and her dermatologist could determine which chemicals Plaintiff "should not be exposed to." (Doc. 26-3, p. 3; see doc. 26-10, p. 7; see also doc. 33-1, pp. 10–11.) Based on her conversations with her dermatologist, Plaintiff informed Nurse Schaber and HR manager Anna Yazbeck that she could not be exposed to a sanitizer spray that the Store used. (Doc. 33-1, p. 11.) Notably, this was the only *product* Plaintiff or her dermatologist identified as of July 2019 that was potentially harmful to Plaintiff. (Doc. 26-3, p. 4; doc. 26-10, p. 7; see doc. 33-1, p. 11.)

According to Nurse Schaber, once she learned that the sanitizer spray was potentially harmful to Plaintiff, she asked Plaintiff to identify which specific chemicals in the sanitizer spray caused the allergic reaction because none of the listed chemicals on the sanitizer spray label matched any of the chemicals on the List. (See doc. 26-3, p. 5.) On July 26, 2019, Plaintiff

responded with the names of two chemicals, and Nurse Schaber subsequently contacted Dawn Alvarez, the purchasing manager for all of Defendant's stores, to find a suitable replacement for the sanitizer spray. (Id. at pp. 5–6; see doc. 33-1, p. 13.) Furthermore, in accordance with Rooms-to-Go regional manager Ken Rickles' instruction, Mizell removed the harmful sanitizer spray from the Store. (See doc. 33-3, pp. 28, 39; doc. 33-13, p. 4; see also doc. 33-1, pp. 14–15.) However, on July 28, 2019, a porter found a can of that sanitizer spray and used it in the Store.[1] (Doc. 33-1, p. 17.) Plaintiff informed the porter that she was allergic to this spray, and Mizell instructed the porter to throw away "th[at] type of spray." (Doc. 33-13, pp. 2–3, 6.) Plaintiff did not see that sanitizer spray again. (Doc. 33-3, p. 39.) Furthermore, Defendant granted Plaintiff excused absences for all her doctor's appointments related to her July 2019 allergic reaction. (Doc. 33-1, p. 21.) Finally, on July 29, 2019, Defendant approved an accommodation request form Plaintiff submitted, which stated that Plaintiff suffered from "chemical allergies" and could not "come in contact" with certain substances. (Doc. 26-3, p. 12; see doc. 33-1, p. 21.)

**3.    Defendant attempted to find a replacement for the sanitizer spray.**

Though Defendant removed the harmful sanitizer spray by the end of July 2019, (doc. 33-3, p. 39; doc. 33-13, pp. 2–3, 6), the process for finding an appropriate replacement cleaner extended until October 2019, (see doc. 33-1, pp. 25, 27–28). As stated above, once Nurse Schaber learned that the sanitizer spray was potentially harmful to Plaintiff, she asked Plaintiff to identify which specific chemicals in the sanitizer spray were harmful. (Doc. 26-3, p. 5.) On July 26, 2019, Plaintiff responded with the names of two chemicals, and Nurse Schaber subsequently contacted Purchasing Manager Alvarez to find an alternative cleaner. (Id. at pp. 5–6; see doc. 33-1, p. 13.) Nurse Schaber and HR Manager Yazbeck also communicated with Plaintiff, asking if there were

---

[1]  A "porter" is an employee responsible for cleaning Defendant's stores. (Doc. 33-1, p. 14.)

any cleaning supplies that Plaintiff used at home that were safe for use in the Store.  (Doc. 33-1, p. 13)  Plaintiff responded with a list of cleaning products and brands that were safe, including Mrs. Myers, Common Good, and Seventh Generation brands.  (Id.; see doc. 33-7, pp. 51–53.)

In September 2019, Defendant's cleaning products supplier recommended that Defendant use a Purell product in the Store.  (See doc. 33-1, pp. 24–25; see also doc. 26-3, p. 18.)  Defendant ordered one bottle of the Purell product "as a test before . . . plac[ing] a larger order."  (Doc. 26-3, p. 20; see doc. 33-1, p. 25.)  After Plaintiff determined that the Purell product contained chemicals to which she was allergic, Defendant arranged a meeting with a representative from its supplier and Plaintiff to discuss other alternative products.  (Doc. 33-1, pp. 27–28.)  Plaintiff and the supplier's representative identified Purell Healthcare Spray as a safe alternative, and Defendant began ordering that product for use in the Store.  (Id. at pp. 28–29; see doc. 26-5, p. 156.)

### D.     Subsequent Incidents Regarding Cleaners

#### 1.     Plaintiff discovered cleaners to which she was allergic in September and October 2019.

Though Defendant removed the sanitizer spray that caused Plaintiff's July 2019 reaction, see Background Section I.C, supra, Plaintiff testified that, in September and October 2019, she encountered two other cleaning products in the Store to which she was allergic.  (Doc. 33-3, p. 39.)  On September 22, 2019, Plaintiff discovered harmful cleaning wipes next to her business cards in the Store.  (Id.)  According to Plaintiff, this was the first time she had seen the cleaning wipes, and she subsequently raised the issue with HR Manager Yazbeck.  (Id.)  Plaintiff testified that she never saw the cleaning wipes again after this incident.  (Id.)  Furthermore, around October 21 or 22, 2019, Plaintiff discovered a porter using a cleaning product—Fabuloso—to which she was allergic.  (Id.)  Plaintiff had not seen Fabuloso used in the Store prior to this incident, and she promptly notified Mizell that the product could trigger her allergies.  (Id.)  Once Mizell was

6

informed of the Fabuloso, he removed that product from the Store.  (See id.; see also doc. 33-5, pp. 167–68.)

### 2.   Defendant conducted flooring renovations and cleaning at the Store.

In September 2019, Defendant began a project to install new flooring in the Store.  (Doc. 33-1, p. 25.)  As part of the flooring project, Defendant had to use an adhesive to which Plaintiff was allergic.  (See id.; see also doc. 26-5, p. 170–74.)  According to Plaintiff, she found out about the project during a morning meeting the day before the project was scheduled to begin.  (Doc. 26-5, p. 170.)  After the meeting, Plaintiff asked Mizell if he knew "what they were going to use to put . . . the new flooring down."  (Id. at p. 172.)  Mizell responded that he did not know and told Plaintiff to "get in touch" with the contractor performing the work.  (Id.)  Plaintiff then asked Mizell to let her know "what was happening the next day" and whether she "should come in [to work] or if he heard anything."  (Id. at pp. 172–73.)  Plaintiff did not hear from Mizell so she went to work the next day.  (Id. at p. 174.)  However, she had to leave due to the use of the adhesive. (Id.)  Plaintiff submitted an accommodation request form, and Defendant granted her a leave of absence for five days.  (Id. at pp. 175–76.; see doc. 33-1, pp. 26–27.)  Furthermore, after the flooring was installed, Mizell spoke with Plaintiff to determine which floor cleaners the Store could use so that Plaintiff would not suffer an allergic reaction.  (Doc. 33-1, p. 26.)  Until a decision was made on an appropriate cleaner, Defendant "damp mopped" the floor so that Plaintiff was not exposed to any harmful chemicals.  (Id.)

Finally, in March 2020, Defendant conducted a cleaning of the Store's interior windows and mirrors.  (Id. at p. 29.)  Though Plaintiff was scheduled to work that day, Mizell rearranged Plaintiff's work schedule so that she would be off work the day the cleaning occurred in case the cleaning required the use of chemicals to which Plaintiff is allergic.  (Id.)

### E.      Plaintiff's Disciplinary Issue

At some point around late August to early September 2019, Defendant's employees from the Store, including Plaintiff, attended a mandatory training session in Charleston, South Carolina, which required Plaintiff to ride with a co-worker in the co-worker's vehicle. (Doc. 26-5, pp. 121–22; see doc. 33-1, p. 30; see also doc. 26-3, p. 51.)  Plaintiff believed that, even though she did not drive, she was entitled to receive reimbursement for "travel time."  (See doc. 26-5, p. 123–24; see also doc. 26-3, p. 51.)   Plaintiff sent an email to HR Manager Yazbeck inquiring into her reimbursement payment, and Yazbeck explained that she was not entitled to reimbursement under Defendant's policy.  (Doc. 33-1, p. 31; see doc. 26-3, p. 52.)  Around September 19, 2019, Chris Vitiello, in accordance with instructions from Defendant's accounts payable department, asked Plaintiff for receipts for the expenses highlighted on her expense report from the trip.[2]  (Doc. 33-3, p. 34; see doc. 26-3, p. 51.)  The parties dispute what occurred next.  According to Vitiello and two other witnesses to the conversation, Plaintiff verbally "attacked" Vitiello in front of other employees and customers.  (See doc. 33-1, pp. 31–32; see also doc. 26-3, pp. 53–55.)  According to one witness, Plaintiff was "rude and unprofessional," demanding that Vitiello "handle her payment for training."  (Doc. 26-3, p. 55.)  Plaintiff denies those characterizations of her behavior. (Doc. 26-5, pp. 126–33.)  Nonetheless, the parties agree that Plaintiff received a "final written warning" on September 23, 2019.[3]  (Doc. 26-3, p. 58; see doc. 33-1, p. 32.)  The Disciplinary Action Form states that Plaintiff "was involved in a conversation on the sale floor that was unprofessional, loud and disrespectful."  (Doc. 26-3, p. 58.)  The final written warning did not

---

[2]  Vitiello is apparently a manager at the Store.  (See doc. 26-3, p. 58.)

[3]  Notably, this is the day after Plaintiff complained about the offensive cleaning wipes she found in the Store.  (Doc. 33-3, p. 39.)

change Plaintiff's employment status, decrease her wages or commissions, or change her work schedule. (Doc. 33-1, p. 33.)

### F.      Accommodations during the COVID-19 Pandemic

Around the beginning of the COVID-19 pandemic (February to March 2020), the Purell Healthcare Spray (the disinfectant spray the Store had used since October 2019 to accommodate Plaintiff) became unavailable. (Id. at p. 36; see doc. 26-6, p. 170.) Plaintiff testified that when the "[COVID-19] pandemic was on the horizon . . ., there was a shortage of hand sanitizer and other products in stores." (Doc. 26-5, p. 167.) Furthermore, according to Mizell, cleaning supplies became "limited" at some point in March or April 2020. (See doc. 26-6, pp. 170–71.) On March 11 or 12, 2020, Plaintiff had a meeting with HR Manager Yazbeck, Mizell, and Regional Manager Rickles. (Doc. 33-14, p. 10.) During that meeting, Rickles informed Plaintiff that "[Defendant] had no alternative but to use cleaners with chemicals to which [Plaintiff] was allergic," and he offered Plaintiff a leave of absence. (Id.) On March 16, 2020, Plaintiff texted Rickles about a Purell cleaner that would accommodate her allergy and work effectively against COVID-19. (Doc. 33-15, pp. 15–17.) Plaintiff also texted Rickles images of the U.S. Environmental Protection Agency's "List N," (see id.), which is a list of "[a]ll products [that] meet the agency's criteria for effectiveness against [COVID-19]," (doc. 26-14, p. 3). Furthermore, Plaintiff testified that she asked or told Mizell to order Mrs. Meyer's, Seventh Generation, or ECOS brand cleaners (i.e., the alternative cleaners she previously told Defendant about) for use in the Store during the pandemic. (Doc. 33-3, pp. 50–51.) According to Plaintiff, these products were available because she was able to purchase these products throughout the pandemic. (See doc. 33-14, p. 11.) However, Defendant never explored obtaining these alternative products. (See doc. 33-10, p. 12.) Though HR Manager Yazbeck and Nurse Schaber submitted Plaintiff's list of cleaners to Purchasing

Manager Alvarez so that Alvarez could "start[] looking into what could be purchased for the [Store]," (doc. 33-7, pp. 53–54), Defendant resorted to using products that contained chemicals harmful to Plaintiff, (doc. 33-1, p. 42).

As a result of the COVID-19 pandemic, Defendant closed all its stores for around a month and furloughed Plaintiff and other sales associates. (Doc. 33-1, p. 41.) In April 2020, the Store reopened, and Mizell contacted Plaintiff with offers to return to work. (Id.) However, Mizell informed Plaintiff that the cleaning products used in the Store during the COVID-19 pandemic may contain chemicals to which Plaintiff was allergic. (Id. at p. 42.) Plaintiff decided not to return to work and, instead, remained on unpaid leave. (Id. at p. 43.) On July 10, 2020, Plaintiff resigned from her position as a sales associate at the Store. (Id.)

## II.     Procedural History

### A.     EEOC Charge

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC Charge") on September 25, 2019. (Doc. 1-1.) In the EEOC Charge, Plaintiff stated that Defendant's discriminatory conduct began on September 15, 2018, and was a "continuing action." (Id. at p. 2.) Under the section titled "Discrimination Based On," Plaintiff checked the boxes for "disability" and "retaliation." (Id.) Under the section titled "The Particulars Are," Plaintiff wrote:

> I began my employment with [Defendant] on August 27, 2018, as a Sales Consultant. I am a qualified individual with a disability of which my employer is aware. I have successfully performed the essential functions of my position satisfactorily. On or about September 15, 2018, I made my employer aware of my disability and informed them of specific chemicals and cleaners that exacerbate my disability. My employer has consistently failed to provide the reasonable accommodation of removing these chemicals which caused a severe and life-threatening reaction on or about July 2, 2019. I have complained to the General Manager Wayne Mizell and HR on multiple occasions. My most recent complaint

> was on September 22, 2019[,] after I found these chemicals located at workstations throughout the store.  The following day Mizell issued me a final warning.
>
> I was told that the final warning was for talking loudly and unprofessionally to Assistant Manager Chris Vitriello.
>
> I believe I have been discriminated and retaliated against due to my disability, in violation of the [ADA].

(Id. at pp. 2–3.)  On August 7, 2020, the EEOC issued a Dismissal and Notice of Rights, indicating that it was "unable to conclude that the information obtained establishes violations of the [ADA]." (Doc. 1-2, p. 2.)

### B.      Proceedings before this Court

Plaintiff filed her Complaint initiating this suit on November 5, 2020, (doc. 1), and Defendant subsequently filed an Answer, (doc. 4).  Defendant then filed the at-issue Motion for Summary Judgment.  (Doc. 26.)  Plaintiff filed a Response, (doc. 35; see doc. 33), and Defendant filed a Reply, (doc. 37).

### STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any

material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove her case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 256–57.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). Accordingly, in considering Defendant's Motion, the Court views the record and draws all reasonable inferences therefrom in the light most favorable to Plaintiff. See Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis omitted).

## DISCUSSION

The Complaint alleges that Defendant violated the ADA by (1) failing to reasonably accommodate Plaintiff's allergic contact dermatitis from August 2018 to July 2020 by refusing her

12

request to remove "all chemicals known to be harmful [to her] and replace them with products that were not known to be harmful to [her]" (Count I); (2) retaliating against Plaintiff for requesting the removal of harmful chemicals and filing "internal complaints" when Defendant refused her accommodation request (Count II); (3) intimidating, threatening, and interfering with her "in the exercise or enjoyment of her rights" under the ADA (Count II); (4) retaliating against Plaintiff for filing the EEOC Charge (Count III); and (5) subjecting Plaintiff to a hostile work environment (Count IV).  (Doc. 1, pp. 13–21.)  Defendant asserts that it moves for summary judgment on all claims.  (Doc. 26, pp. 13–25; see doc. 37, pp. 3–21.)

## I.    ADA Failure to Accommodate Claim

Defendant argues that Plaintiff's failure to accommodate claim fails because the undisputed facts demonstrate that it provided Plaintiff with reasonable accommodations.  (Doc. 26, p. 13.) "An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability—unless doing so would impose undue hardship on the employer."  Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001) (citing 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a)).  "An accommodation is reasonable, and thus required under the ADA, only if it allows the employee to perform the essential functions of the job."  Early v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000). Examples of reasonable accommodations include "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position."  Spears v. Creel, 607 F. App'x 943, 948 (11th Cir. 2015) (quoting 42 U.S.C. § 12111(9)(B)).  Furthermore, "[e]ssential functions are 'the fundamental job duties of the employment position the individual with a disability holds or desires.'"  Id. (quoting 29 C.F.R. § 1630.2(n)(1)).  "The plaintiff bears the burden of identifying

13

an accommodation, and of demonstrating that the accommodation allows [her] to perform the job's essential functions." Lucas, 257 F.3d at 1255–56.

According to Defendant, it reasonably accommodated Plaintiff by (1) engaging in an interactive conversation to identify harmful chemicals and suitable replacements; (2) using indisputably harmless alternative cleaners until an alternative cleaner could be found; (3) procuring a suitable alternative; (4) modifying Plaintiff's work schedule to prevent contact with harmful chemicals; (5) disposing of all cleaners harmful to Plaintiff; (6) using water and vinegar to clean the Store; (7) notifying all porters to refrain from using chemicals harmful to Plaintiff; (8) working with suppliers to find products safe for Plaintiff; (9) permitting Plaintiff to take leaves of absence when her allergy condition bothered her; (10) rearranging Plaintiff's work schedule during major store cleanings and renovations; (11) connecting Plaintiff with the Store's cleaning products supplier; and (12) finding suitable alternatives and using those until the COVID-19 pandemic began. (Id. at pp. 14–16.) Plaintiff responds that Defendant did not reasonably accommodate her disability. (Doc. 35, pp. 4–11.) According to Plaintiff, she first requested an accommodation in September 2018 when she informed Mizell about her allergy and requested that he "secure in the [S]tore her three-ring binder with a list of chemicals to which she is allergic." (Id. at p. 4.) However, Plaintiff argues, Mizell denied that accommodation, which caused her to suffer the July 7, 2019, allergic reaction. (Id. at p. 5.) Thus, according to Plaintiff, Defendant failed to reasonably accommodate her from September 2018 through July 7, 2019. (Id. at p. 6.) Plaintiff further contends that Defendant failed to accommodate her after July 7, 2019, and throughout the COVID-19 pandemic as well. (Id. at pp. 6–11.)

### A.   Whether Plaintiff requested a reasonable accommodation prior to July 2019

Defendant argues that it is entitled to summary judgment on Plaintiff's failure to accommodate claim—to the extent the claim is based on Defendant's conduct prior to July 2019—because Plaintiff failed to request an accommodation prior to July 2019, and even if Plaintiff requested an accommodation prior to July 2019, that claim is time barred.  (Doc. 37, pp. 4–6; id. at p. 6 n.4.)  Plaintiff argues that she requested a reasonable accommodation in September 2018 shortly after she began working at the Store but that Mizell denied that accommodation.  (Doc. 35, pp. 4–6.)  Specifically, Plaintiff argues that she informed Mizell that she was "allergic to chemicals in cleaning supplies and requested that [the Store] not have those chemicals in the workplace." (Id. at p. 6.)  However, according to Plaintiff, Mizell "failed to take any action . . . in response to that request."  (Id.)

The Court finds that Plaintiff failed to make an adequate request for a reasonable accommodation prior to July 2019.[4]  A plaintiff cannot succeed on a failure to accommodate claim under the ADA unless he or she made an adequate request for a reasonable accommodation.  See, e.g., Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999) ("[T]he

---

[4]  Defendant also argues that Plaintiff's failure to accommodate claim, to the extent the claim is based on its conduct in September 2018, is time barred because Plaintiff did not file the EEOC Charge until September 2019.  (Doc. 37, p. 6 n.4.)  However, "if a defendant fails to timely raise the defense that the plaintiff did not timely file a charge of discrimination, the defendant waives that defense and the claim supported by an untimely EEOC charge may proceed."  Reddick v. Republic Parking Sys., No. 2:17-cv-00728-KOB, 2019 WL 2601547, at *1 (N.D. Ala. June 25, 2019) (citing Fort Bend County v. Davis, 139 S. Ct. 1843, 1849–50 (2019)).  Here, Defendant failed to specifically raise the issue of timeliness in its Answer or Motion for Summary Judgment.  (See docs. 4, 26, 26-1.)  Rather, Defendant first raised the issue in its Reply.  (See doc. 37, p.6 n.4.)  Therefore, the Court finds that Defendant has waived this defense.  See Reddick, 2019 WL 2601547, at *1 ("Districts courts in the Eleventh Circuit have consistently found that a defendant waives the untimely EEOC charge defense when the defendant never specifically raises the defense in a responsive pleading, motion to dismiss, or motion for summary judgment."); Ham v. City of Atlanta, No. 1:07-CV-309-BBM-RGV, 2009 WL 10668310, at *7 (N.D. Ga. July 22, 2009) ("Defendants' effort to raise the exhaustion issue for the first time in their reply brief is unavailing.  It is well-settled that an argument cannot be raised for the first time in a reply brief, and such an argument is subject to being stricken.").

duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made . . . .").  "An employee makes an adequate request for a reasonable accommodation when it is sufficiently specific and reasonable."  Laun v. Bd. of Univ. Sys. of Ga., No. 1:18-cv-033, 2019 WL 4694940, at *9 (S.D. Ga. Sept. 25, 2019) (citing Gaston, 167 F.3d at 1363–64; Willis v. Conopco, Inc., 108 F.3d 282, 284–85 (11th Cir. 1997)); see Wilson v. Sec'y of Veterans Affs. Dep't of Veteran Affs., No. 20-10799, 2022 WL 1907863, at *5 (11th Cir. June 3, 2022) ("To trigger an employer's obligation to provide a reasonable accommodation, the employee must make a specific demand for one and demonstrate that the requested accommodation is reasonable.") (citing Gaston, 167 F.3d at 1363; Willis, 108 F.3d at 284–85).

To make an adequately specific accommodation request, "an individual may use 'plain English' and need not mention the ADA or use the phrase 'reasonable accommodation.'" Coker v. Enhanced Senior Living, Inc., 897 F. Supp. 2d 1366, 1379 n.10 (N.D. Ga. 2012).  Rather, it is sufficient if the request is "definite enough that under the circumstances, the employer can be said to know of both the disability and desire for an accommodation."  Laun, 2019 WL 4694940, at *9; see Adigun v. Express Scripts, Inc., 742 F. App'x 474, 476–77 (11th Cir. 2018).  Furthermore, "[t]he reasonableness of a requested accommodation is a fact-intensive inquiry."  Laun, 2019 WL 4694940, at *9 (citing Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir. 1997)).  To prove "reasonable accommodation," a plaintiff must "show . . . that the *proposed accommodation would enable her to perform the essential functions of her job*."  Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1262 n.16 (11th Cir. 2007) (emphasis added); see Flowers v. City of Tuscaloosa, No. 7:11-cv-01375-JEO, 2013 WL 625324, at *13 (N.D. Ala. Feb. 14, 2013) ("An accommodation that does not enable the employee to perform an essential function

16

of his position is facially unreasonable and is not required by the ADA.") (quoting Holly, 492 F.3d at 1262 n.16).

The Court concludes that Plaintiff failed to demonstrate that she requested a reasonable accommodation. Plaintiff testified that, shortly after she was hired, she discussed her allergy with Mizell and told him that she was allergic to "specific chemicals." (Doc. 33-3, p. 24.) She asked about "the proper way" to keep the List in the Store, and Mizell rejected her request, stating that "[u]nless there was an incident, it was not important to have the list in the store." (Id.) However, Plaintiff fails to explain how storing a list of chemicals to which she is allergic in the Store would enable her to fulfill the essential functions of her sales position. (See doc. 35, pp. 4–6.) Indeed, contrary to Plaintiff's assertion, Plaintiff did not testify that she requested Mizell to check the Store's existing cleaners for harmful chemicals or remove any offending cleaners. (See doc. 35, p. 6; see also doc. 33-3, p. 24.) Rather, Plaintiff in her deposition testimony admitted that she did not "ask [Mizell] for anything else" other "than having the [L]ist in the [S]tore" when she mentioned her allergy to Mizell in September 2018. (Doc. 33-3, p. 24.) Furthermore, Plaintiff has not pointed to any record evidence indicating that having the List in the Store, without more, would have prevented Plaintiff from suffering allergic reactions or otherwise permitted her to fulfill the essential functions of a sales associate position. (See doc. 35, pp. 4–6.) Finally, Plaintiff has not pointed to any evidence that she ever explained to Mizell how having the List in the Store would resolve or alleviate her allergy. (See id.) Therefore, the Court concludes that Plaintiff's requested accommodation in September 2018 was not reasonable and, therefore, not required by the ADA.[5]

---

[5] Relying on the Declaration of former Rooms-to-Go employee Andria Ware, Plaintiff argues that she "brought the issue of her allergy to . . . Mizell's attention on numerous occasions prior to the allergic reaction in July 2019." (Doc. 35, p. 4; see doc. 33-1, p. 17.) However, in her Declaration, Ware did not elaborate on any specific requests Plaintiff made to Defendant or if Plaintiff connected any requests for accommodation to her disability. (See doc. 33-11, pp. 2–6.) Thus, to the extent Plaintiff relies on these

Cf. Wilson, 2022 WL 1907863, at *4 ("[U]nder the Rehabilitation Act, Wilson needed only request the accommodation and demonstrate that it is reasonable.  It was therefore sufficient that Wilson requested to park on-site and justified her request by informing the VA about her mobility limitations and her belief that the accommodation would resolve the issue.");[6] see Beasley v O'Reilly Auto Parts, 559 F. Supp. 3d 1226, 1236 (S.D. Ala. 2021) ("The plaintiff must . . . prove that 'he made a specific request for a *reasonable* accommodation' . . . .") (emphasis added) (quoting D'Onofrio v. Costco Wholesale Corp., 964 F.3d 1014, 1021 (11th Cir. 2020)); Gaston, 167 F.3d at 1364 ("Gaston's failure to demand a *reasonable* accommodation after being shown the new job requirements is fatal to her ability to prevail on her claim that Bellingrath Gardens discriminated against her by failing to provide a reasonable accommodation.") (emphasis added).

Based on the foregoing, the Court finds that Defendant is entitled to summary judgment on Plaintiff's ADA failure to accommodate claim, to the extent that claim is based on Defendant's conduct prior to July 7, 2019.

### B.    Whether Defendant reasonably accommodated Plaintiff from July 2019 to the COVID-19 Pandemic

Defendant next argues that it provided reasonable accommodations to Plaintiff from July 2019 until the beginning of the COVID-19 pandemic.  (Doc. 26, pp. 13–16; doc. 37, pp. 7–11.)

---

"requests" to show she requested a reasonable accommodation prior to July 2019, the Court finds that Plaintiff has failed to show that they were sufficiently specific or reasonable.  The Court also notes that Plaintiff's deposition testimony directly contradicts Ware's Declaration. Indeed, though Ware stated in her Declaration that Plaintiff "complained to management about cleaning chemicals quite often before July 2019," (id. at p. 3), Plaintiff admitted in her deposition that, other than her conversation with Mizell in September 2018, she did not have "a discussion with . . . anybody at Rooms[-]to[-]Go about [her] allergies" until after her allergic reaction in July 2019, (doc. 33-3, p. 24).

[6]  The Court notes that "Rehabilitation Act cases are regarded as authorities for interpreting the ADA." Cramer v. Florida, 885 F. Supp. 1545, 1551 n.1 (M.D. Fla. 1995); see Allmond v. Akal Sec., Inc., 558 F.3d 1312, 1316 n.3 (11th Cir. 2009) ("[T]he same standards govern discrimination claims under the Rehabilitation Act and the ADA . . . ."); Boyle v. City of Pell City, 866 F.3d 1280 1288, n.5 (11th Cir. 2017) ("[C]ases involving the ADA are precedent for those involving the Rehabilitation Act.").

Specifically, Defendant contends that it: (1) "excus[ed] all absences that resulted from medical visits related to [Plaintiff's] allergic reactions"; (2) "ask[ed] [Plaintiff] to have her doctor identify the allergens in [Plaintiff's] work environment"; (3) "us[ed] water and vinegar to clean the [S]tore before alternative cleaners could be located"; (4) "collaborat[ed] to locate replacement cleaners for the . . . [S]tore"; (5) "dispos[ed] of all cleaning supplies in the [S]tore that [Plaintiff's] doctor identified (one spray cleaner) as potentially harmful"; (6) "dispos[ed] of any supplies that [Plaintiff] identified as possibly harmful"; (7) "permit[ed] [Plaintiff] a two day leave of absence while the . . . [S]tore had new flooring installed with the use of an epoxy resin to which [Plaintiff] was allergic"; (8) "damp mopp[ed] the new floor until cleaners that [Plaintiff] approved could be found;" and (9) "rearrang[ed] [Plaintiff's] shifts in March 2020, before the pandemic shuttered all businesses in Georgia, to avoid interior window cleaning that involved the use of potentially triggering chemicals."  (Doc. 37, pp. 7–8; see doc. 26, pp. 14–16.)  Plaintiff responds that Defendant's efforts "fall short of an accommodation" required by the ADA because Defendant failed to effectively carry out those accommodations.  (Doc. 35, p. 8; see id. at pp. 6–11.)  Though Plaintiff does not contest that Defendant either made, or attempted to make, several of the above accommodations, (doc. 33-1, pp. 15, 21, 26, 29), Plaintiff generally argues that Defendant did not reasonably accommodate her because Defendant failed to remove all of the chemicals to which she was allergic from the Store, (see doc. 35, pp. 6–11; see also doc. 26-3, p. 59 (Plaintiff's EEOC Charge stating that Defendant "has consistently failed to provide the reasonable accommodation of removing the[] chemicals which caused a severe and life-threatening [allergic] reaction on or about July 2, 2019").)

"An accommodation is reasonable, and thus required under the ADA, only if it allows the employee to perform the essential functions of the job."  Early, 207 F.3d at 1365.  Examples of

reasonable accommodations include "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." Spears, 607 F. App'x at 948 (quoting 42 U.S.C. § 12111(9)(B)).  "[A] reasonable accommodation need not be perfect or the one most strongly preferred by the plaintiff . . . ." Todd v. Carstarphen, 236 F. Supp. 3d 1311, 1334 (N.D. Ga. 2017) (quoting Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016)); see, e.g., Happy Herman's Cheshire Bridge, Inc., 117 F.3d at 1286 ("[U]nder the ADA, a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation.") (internal quotations omitted).  Furthermore, "[e]ssential functions are 'the fundamental job duties of the employment position the individual with a disability holds or desires.'" Id. (quoting 29 C.F.R. § 1630.2(n)(1)).  "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows [her] to perform the job's essential functions." Lucas, 257 F.3d at 1255–56.

The Court concludes that Defendant reasonably accommodated Plaintiff from July 2019 to the COVID-19 pandemic.  First, Plaintiff admits that the Store excused Plaintiff from work so that she could attend her medical appointments to treat her July 7, 2019, allergic reaction and rearranged her work schedule during the Store's floor renovations and March 2020 window cleaning.  (Doc. 33-1, pp. 21, 26, 29.)  Plaintiff also concedes that Mizell spoke with her after the Store's floor renovations to determine which floor cleaners were safe for her, and the Store "damp mopped" the floor so that Plaintiff was not exposed to any harmful chemicals.  (Id. at p. 26.)  Though Plaintiff complains that she could not work (and, thus, was not paid) during those times, (Id. at p. 21; doc. 35, p. 9), "*[u]npaid* leave is . . . one of many accommodations explicitly suggested in the EEOC regulations implementing the ADA," Madden v. City of Carrollton, No. 3:16-cv-200-TCB, 2018 WL 2057359, at *5 (N.D. Ga. Mar. 15, 2018) (emphasis added) (citing

20

29 C.F.R. app. § 1630.2(o) ("[A]ccommodations could include . . . providing additional unpaid leave for necessary treatment")); see Happy Herman's Cheshire Bridge, Inc., 117 F.3d at 1286 (finding that a leave of absence was a reasonable accommodation); Wood v. Green, 323 F.3d 1309, 1314 (11th Cir. 2003) ("[A] leave of absence might be a reasonable accommodation in some cases."). The Court finds that, under the circumstances of this case, the periods of unpaid leave constituted reasonable accommodations.

Furthermore, Plaintiff concedes that Defendant worked with her to remove harmful cleaning products and replace them with ones that did not trigger her allergy. (See doc. 33-1, p. 15.) In accordance with Defendant's provided accommodation, Plaintiff was supposed to identify the products to which she was allergic, and Defendant would subsequently remove those products from the Store. (See id.; doc. 26-6, p. 135.) Furthermore, once Plaintiff identified those products, Defendant's purchasing department "knew not to fulfill . . . [or] make any requests for those products." (Doc. 26-9, p. 13.) For example, Defendant removed and replaced a sanitizer spray Plaintiff indicated was harmful. Specifically, after Plaintiff suffered the allergic reaction in July 2019, Nurse Schaber permitted Plaintiff to take the Material Safety Data Sheets, which document the chemicals used in the Store, to her doctor so that Plaintiff's doctor could review the list of cleaning products and chemicals used in the Store. (Doc. 26-3, pp. 2–3; doc. 26–10, p. 7.) According to Schaber, this was done so that Plaintiff's doctor could review which products Plaintiff "should not be exposed to." (Doc. 26-10, p. 7.) From her discussion with her doctor, Plaintiff identified one product, a sanitizer spray, to which she should not be exposed. (Doc. 26-3, p. 4; doc. 26-10, p. 7; see doc. 33-1, p. 11.) Once Schaber learned of the harmful sanitizer spray, Schaber asked Plaintiff about which specific chemicals in the sanitizer spray were harmful because none of the listed chemicals on the spray matched any of the chemicals on the List. (Doc. 26-3, p.

21

5.) Plaintiff responded with the names of two chemicals in the sanitizer spray, and Schaber subsequently contacted Purchasing Manager Alvarez to find a suitable replacement for the sanitizer spray. (Id. at pp. 5–6; see doc. 33-1, p. 13.) Mizell then removed the harmful sanitizer spray from the Store. (See doc. 33-3, pp. 28, 39; doc. 33-13, p. 4.)

Moreover, Defendant coordinated with Plaintiff and its cleaning products supplier to find a replacement cleaner. Specifically, in October 2019, Defendant ordered one bottle of a Purell cleaning product as a test for Plaintiff before placing a larger order. (Doc. 33-1, p. 25.) When Plaintiff determined that the Purell product was not safe, Defendant arranged a meeting with both a representative of its supplier and Plaintiff to discuss product information and alternative products. (Id. at pp. 27–28.) Plaintiff and the supplier's representative identified Purell Healthcare Spray as a safe, alternate cleaning product, and Defendant began ordering that product for use in the Store. (Id. at p. 28; see doc. 26-5, p. 156.)

Plaintiff argues that, despite Defendant's efforts, "offensive cleaning supplies kept appearing." (Doc. 35, p. 7.) Plaintiff, for example, points to the incident on July 28, 2019, as well as incidents in September and October 2019 during which she found harmful cleaning products in the Store. (See id.) However, Plaintiff has not pointed to any evidence indicating that she had complained about these products in the Store prior to the incidents involving those products. (See doc. 35.) For example, on September 22, 2019, Plaintiff notified Defendant about cleaning wipes that contained harmful chemicals. (Doc. 33-3, p. 39.) However, that was the first and only time Plaintiff ever saw those cleaning wipes. (See id.) Indeed, Plaintiff testified that she had not seen those cleaning wipes prior to September 22, 2019, and that she never saw them again in the Store after she complained. (See id.) Furthermore, after Plaintiff notified Defendant of the harmful cleaners, Defendant removed the cleaners from the Store. (See id. at p. 39 (Plaintiff's testimony

22

that she never saw the harmful disinfectant spray after July 28, 2019);[7] id. (Plaintiff's testimony that she never saw the harmful cleaning wipes again after she complained in September 2019); id. at p. 44 (Plaintiff's testimony that she never saw Fabuloso used in the Store after she complained in October 2019).)  Though Plaintiff appears to argue that Defendant should have sorted through each and every cleaner in the Store to remove the ones with harmful chemicals after she sent Defendant the List, (doc. 35, pp. 6–11), the ADA "does not require an employer to create an environment completely free of fumes, dust, mold, or other allergens to accommodate an employee's health condition," Maddox v. Ala. Dep't of Transp., No. 2:15-cv-00312-MHH, 2018 WL 3241212, at *2 (N.D. Ala. July 3, 2018).  Indeed, Plaintiff is not entitled to a "perfect," "maximum," or even a "preferred" accommodation.  Todd, 236 F. Supp. 3d at 1334 (quoting Wright, 831 F.3d at 72); Siudock v. Volusia Cnty. Sch. Bd., 568 F. App'x 659, 663–64 (11th Cir. 2014) (finding that employer did not need to provide employee with "the accommodation of [the employee's] choice, or the maximum accommodation or every conceivable accommodation possible") (internal quotations omitted); Hartsfield v. Miami-Dade County, 90 F. Supp. 2d 1363, 1372 (S.D. Fla. 2000); Jernigan v. Bellsouth Telecomms., LLC, 17 F. Supp. 3d 1317, 1325 n.7 (N.D. Ga. 2014) ("[A]n employer is not required to provide an employee with 'the maximum accommodation or every conceivable accommodation possible.'").  Instead, "[t]he ADA requires only a reasonable accommodation." Hartsfield, 90 F. Supp. at 1372.  As described in detail above, Defendant took several reasonable actions to address Plaintiff's allergy. See Cheese v. Navy Fed. Credit Union, No. 3:19cv6-TKW-HTC, 2020 WL 7485361, at *5 (N.D. Fla. Aug. 7, 2020) ("[I]t

---

[7] On July 28, 2019—the day after Mizell disposed of what he thought were all of the cans of the harmful disinfectant spray—a porter sprayed a can of the spray in the Store while Plaintiff was working. (Doc. 33-1, p. 17.)  Plaintiff informed the porter that she was allergic to this spray, and Mizell instructed the porter to throw away "th[at] type of spray." (Doc. 33-13, pp. 2–3, 6.)  Plaintiff did not see that disinfectant spray again. (Doc. 33-3, p. 39.)

is undisputed that Defendant took reasonable actions to address Plaintiff's sensitivities to perfumes and cleaning supplies by asking people not to use perfumes or sprays in the bathroom Plaintiff frequented and not to spray perfumes or other strong scents at work (or even before work) and by arranging office cleaning to prevent Plaintiff from coming into contact with potentially triggering cleaning products."); Maddox, 2018 WL 3241212, at *2 (finding that employer reasonably accommodated plaintiff where employer "provided a number of accommodations to [plaintiff] to address her disability").

Finally, to the extent Plaintiff complains about Defendant's delay in accommodating her, (see doc. 35, pp. 7–10), the Court finds that argument unpersuasive.  The evidence indicates Defendant began accommodating Plaintiff less than a month after Plaintiff's allergic reaction in July 2019 by granting Plaintiff excused absences to attend her doctor's appointments to treat and determine the cause of her allergic reaction.  (See doc. 33-3, pp. 17–18, 20–25; see also doc. 33-1, pp. 8, 21.)  Furthermore, in late July 2019, Defendant began removing and looking for a replacement for the sanitizer spray Plaintiff and her doctor identified as harmful.  (See doc. 33-1, pp. 11, 13, 15; see also doc. 26-3, pp. 2–5; doc. 26-6, p. 135; doc. 26–10, p. 7.)  Though the process for obtaining an appropriate replacement took several months, (see doc. 33-1, pp. 25–28), "[e]mployers must be given an opportunity to process requests for accommodation and institute appropriate remedial measures."  Russell v. City of Tampa, No. 8:14-cv-814-T-17AEP, 2015 WL 5871189, at *4 (M.D. Fla. Oct. 5, 2015).  Indeed, "[c]ourts in [the Eleventh Circuit] have sanctioned delays as long as several months as a matter of law."  Anderson v. Bellsouth Telecomms., LLC, No. 2:12-cv-03537-RDP, 2015 WL 461698, at *11 (N.D. Ala. Feb. 4, 2015) (citing Terrell v. USAir, Inc., 955 F. Supp. 1448, 1454 (M.D. Fla. 1996); Hartsfield, 90 F. Supp. 2d at 1373); see, e.g., Terrell v. USAir, 132 F.3d 621, 627–28 (11th Cir. 1998) (three-month delay

by the employer in granting a requested accommodation was not unreasonable). This is especially true in cases such as this one where Defendant "clearly was moving forward in [its] efforts to find suitable" accommodations for Plaintiff. Alabi v. Atlanta Public Schs., No. 1:12-CV-0191-AT, 2011 WL 11785485, at *12–13 (N.D. Ga. Sept. 26, 2011).

Based on the foregoing, the Court finds that Defendant is entitled to summary judgment on Plaintiff's ADA failure to accommodate claim, to the extent the claim is based on Defendant's conduct from July 7, 2019, to February 2020 (i.e., the beginning of the COVID-19 pandemic).

**C.    Whether Defendant reasonably accommodated Plaintiff during the COVID-19 Pandemic**

Defendant next argues that it is entitled to summary judgment on Plaintiff's failure to accommodate claim—to the extent that claim is based on Defendant's conduct after the COVID-19 pandemic began—because, at that point in time, accommodating Plaintiff with "substitute cleaners" inflicted an undue hardship on Defendant. (Doc. 37, pp. 11–15; see doc. 26, pp. 17–19.) According to Defendant, the cleaner that "successfully accommodated [Plaintiff] from late October 2019 until the pandemic struck, as well as almost all other sanitizing wipes, sprays, and liquids, became unavailable." (Doc. 26, p. 17.) Furthermore, Defendant argues, "the existence of a new and deadly disease required [it] to implement extraordinary measures to ensure that its stores were safe for everyone, not just [Plaintiff]." (Id.) Thus, "[t]o ensure the safety of its employees and the public . . ., [Defendant] had to use cleaners that it could be sure would neutralize any pathogens on surfaces." (Id.) Plaintiff responds that Defendant failed to show that the substitute cleaner was unavailable and that, even if the substitute cleaner was unavailable, other safe cleaners existed and were available that were effective against COVID-19. (See doc. 35, pp. 13.) Plaintiff also argues that Defendant "waived the potential affirmative defense of undue hardship" by failing to plead it in its answer. (See id. at pp. 11–12.)

25

**1.      Defendant did not waive the affirmative defense of undue hardship.**

As an initial matter, the Court finds that Defendant did not waive the affirmative defense of undue hardship.  Federal Rule of Civil Procedure 8(c) provides that "[i]n responding to a pleading, a party must affirmatively state any . . . affirmative defense."  Fed. R. Civ. P. 8(c). "[T]his requires, at the minimum, putting the plaintiff on notice of the nature of the defense." MidAmerica C2L Inc. v. Siemens Energy Inc., 25 F.4th 1312, 1338 (11th Cir. 2022) (citing Blonder-Tongue Lab'ys Inc. v. Univ. of Ill. Found., 402 U.S. 313, 350 (1971)).  Indeed, "[a]n affirmative defense should survive if it comports with Rule 8(c)'s purpose—'guarantee[ing] that the opposing party has notice of any additional issue that may be raised at trial.'"  Tomason v. Stanley, 297 F.R.D. 541, 545 (S.D. Ga. 2014) (quoting Hassan v. U.S. Postal Serv., 842 F.2d 260, 263 (11th Cir. 1988)).  The failure to affirmatively state an affirmative defense in an answer "results in a waiver of that defense."  Frederick v. Kirby Tankships, Inc., 205 F.3d 1277, 1287 (11th Cir. 2000).  Finally, undue hardship under the ADA is an affirmative defense.  Willis, 108 F.3d at 286 ("[U]ndue hardship is an affirmative defense to be pled and proven by an ADA defendant.").

Here, in its Answer to the Complaint, Defendant stated—under a section entitled "Affirmative Defenses"—the following: "After the pandemic began, no reasonable accommodation existed that would have allowed Plaintiff to perform the essential functions of her job *without imposing an undue burden on [Defendant]* and endangering [Defendant's] employees and members of the public visiting its stores."  (Doc. 4, p. 2 (emphasis added).)  Defendant also stated in its Answer that it "consulted with Plaintiff in good faith to identify and make reasonable accommodations that would provide Plaintiff with an equally effective opportunity *that would not cause [Defendant] an undue hardship*."  (Id. (emphasis added).)  The Court concludes that these

statements provided Plaintiff "fair notice" of Defendant's undue hardship defense argued in its Motion for Summary Judgment.  See, e.g., Jackson v. City of Centreville, 269 F.R.D. 661, 663 (N.D. Ala. 2010) (statement saying, "Defendant pleads the defenses of waiver, res judicata, estoppel, judicial estoppel, collateral estoppel, and ratification," sufficiently apprised plaintiffs of what "Defendants [would] argue, which is all the Eleventh Circuit [Court of Appeals] requires") (citing Hassan, 842 F.2d at 263); Birren v. Royal Caribbean Cruises, Ltd., 336 F.R.D. 688, 693 (S.D. Fla. 2020) (rejecting plaintiffs' argument that affirmative defense should be stricken because it failed to plead "even minimum facts as to how [it] might be applicable," explaining that the defense as pled "sufficiently apprise[d]" plaintiffs of defendant's "intent to raise the issue"); see also Tsavaris v. Pfizer, Inc., 310 F.R.D. 678, 682 (S.D. Fla. 2015) ("Rule 8 does not obligate a defendant to set forth detailed factual allegations . . . .").  Therefore, Defendant did not waive the affirmative defense of undue hardship.

> **2.     A dispute of fact exists as to whether the proposed accommodations for Plaintiff created an undue hardship on Defendant after the COVID-19 pandemic began.**

Defendant argues that its prior accommodations of Plaintiff placed an undue hardship on it once the COVID-19 pandemic began because it was unable to procure the substitute cleaners and needed to revert to using the harmful cleaners to protect its employees and visitors in the Store during the pandemic.  (See doc. 26, pp. 17–19; doc. 37, pp. 11–15.)  Plaintiff responds that a question of material fact exists as to whether the substitute cleaners were unavailable and that, even if they were unavailable, other "cleaners without offending chemicals that killed COVID[-19] were in fact available during the pandemic."  (Doc. 35, p. 13.)

"An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability—*unless doing*

*so would impose undue hardship on the employer.*"    Lucas, 257 F.3d at 1255 (emphasis added) (citing 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a)).  The employer bears the burden of showing that a proposed accommodation would impose an undue hardship.  See Connelly v. Wellstar Health Sys., Inc., 758 F. App'x 825, 831 (11th Cir. 2019).  "To meet its burden of proof, the employer 'must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'"  Davis v. Columbus Consol. Gov't, 826 F. App'x 890, 893 (11th Cir. 2020) (quoting US Airways, Inc. v. Barnett, 535 U.S. 391, 402 (2002)).  To determine "whether an accommodation would impose an undue hardship," courts consider "the nature and cost of the accommodation, the overall financial impact of the accommodation on the employer, the type of operations of the employer, and the impact of the accommodation on day-to-day operations, including the impact on the ability of other employees to perform their duties."  Mattingly v. Univ. of S. Fla. Bd. of Trs., 931 F. Supp. 2d 1176, 1184 (M.D. Fla. 2013); see Davis, 826 F. App'x at 893; E.E.O.C. v. Eckerd Corp., No. 1:10-cv-2816-JEC, 2012 WL 2726766, at *9 (N.D. Ga. July 9, 2012) (quoting 42 U.S.C. § 12111(10)(B)).  "The Supreme Court has described 'undue hardship' as any act requiring an employer to bear more than a '*de minimis* cost' in accommodating an employee."  Mattingly, 931 F. Supp. 2d at 1185 (quoting Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 84 n.15 (1977)).

Here, the evidence indicates that, in March 2020, the Purell Healthcare Spray—the disinfectant spray the Store had used since October 2019 to accommodate Plaintiff—became unavailable.  (Doc. 33-1, p. 36; see doc. 26-6, p. 170.)  Indeed, Plaintiff testified that when the "[COVID-19] pandemic was on the horizon . . ., there was a shortage of hand sanitizer and other products in stores."  (Doc. 26-5, p. 167.)  Furthermore, though he could not recall an exact date, Mizell testified that cleaning supplies became "limited" at some point in March or April 2020.

(See doc. 26-6, pp. 170–71.)  On March 11 or 12, 2020, Plaintiff had a meeting with HR Manager Yazbeck, Mizell, and Regional Manager Rickles.  (Doc. 33-14, p. 10.)  During that meeting, Rickles informed Plaintiff that "they had no alternative but to use cleaners with chemicals to which [Plaintiff] was allergic," and he offered Plaintiff a leave of absence.  (Id.)  Then, on March 16, 2020, Plaintiff texted Rickles about a Purell cleaner that would accommodate her allergy and work effectively against COVID-19.  (Doc. 33-15, pp. 15–17.)  Plaintiff also texted Rickles images of the U.S. Environmental Protection Agency's "List N," (see id.), which is a list of "[a]ll products [that] meet the agency's criteria for effectiveness against [COVID-19]," (doc. 26-14, p. 3).  Plaintiff testified that she asked or told Mizell to order Mrs. Meyer's, Seventh Generation, or ECOS brand cleaners for use in the Store during the pandemic.  (Doc. 33-3, pp. 50–51.)  According to Plaintiff, these products were available as she was able to purchase them throughout the pandemic.  (See doc. 33-14, p. 11.)  However, Defendant never explored obtaining these alternative products.  (See doc. 33-10, p. 12.)  Instead, Defendant resorted to using products that contained chemicals harmful to Plaintiff.  (Doc. 33-1, p. 42.)

Based on the foregoing, the Court finds that Defendant failed to satisfy its burden of showing that there is no dispute of fact that Plaintiff's requested accommodations imposed an undue hardship on it.  While—as stated above—the Purell Healthcare Spray was unavailable during the pandemic, (id. at p. 36), Plaintiff requested and recommended that Defendant procure several other products that would accommodate her disability and were—when examining the facts in the light most favorable to Plaintiff—readily available, (doc. 33-14, p. 11).  Defendant does not even address Plaintiff's request for these alternative products.  (See doc. 26, pp. 17–19; doc. 37, pp. 11–15.)  Rather, Defendant contends generally, without citation to the record, that the "pandemic limited the availability of cleaning products."  (Doc. 37, p. 12).  Furthermore,

Defendant failed to address any of the factors outlined in 42 U.S.C. § 12111(10)(B).  (See doc. 26, pp. 17–19; doc. 37, pp. 11–15.)  Thus, the Court concludes that, at this stage, Defendant failed to submit sufficient evidence to show that it would suffer undue hardship.  See Robinson v. RockTenn CP, LLC, 986 F. Supp. 2d 1287, 1308 (N.D. Ala. 2013) ("The employer . . . has the burden of persuasion on whether an accommodation would impose an undue hardship.") (citing Holbrook v. City of Alpharetta, 112 F.3d 1522, 1526 (11th Cir. 1997)); see also id. at 1310 (finding no undue hardship where defendant failed to submit evidence that plaintiff's requested accommodation "would present any type of hardship"); Lakes v. Fulton Cnty. Sch. Dist., No. 1:17-cv-04685-WMR-CMS, 2019 WL 13131392, at *22 (N.D. Ga. Aug. 22, 2019) ("Defendant . . . failed to argue or submit any probative evidence from which the Court could conclude that providing the accommodation requested by Plaintiff would have caused an undue hardship on the operation of the School District.  Absent such evidence, the Court cannot rule as a matter of law that the School District satisfied its obligations under the ADA.").

Finally, the Court finds unpersuasive Defendant's argument that it provided a reasonable accommodation to Plaintiff during the COVID-19 pandemic in the form of unpaid leave.  (See doc. 37, pp. 13–14.)  Though "a leave of absence might be a reasonable accommodation in some cases," the Eleventh Circuit has stated that a reasonable accommodation "is by its terms most logically construed as that which, *presently, or in the immediate future,* enables the employee to perform the essential functions of the job in question."  Wood, 323 F.3d at 1313 (quoting Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1226 (11th Cir.1997) (per curiam)) (emphasis added).  Here, Defendant does not point to any evidence indicating that its proposed leave of absence during the COVID-19 pandemic had an end point.  (See doc. 37, pp. 13–14.)  Indeed, the pandemic could have ended within a month or two (thus permitting Defendant to procure the Purell Healthcare

Spray) or lasted for an extended period of time. Therefore, the Court cannot conclude that Defendant's offer of an unpaid leave of absence was a "reasonable" accommodation. See Wood, 323 F.3d at 1314 ("Wood was requesting an indefinite leave of absence. Wood might return to work within a month or two, or he could be stricken with another cluster headache soon after his return and require another indefinite leave of absence. Wood was not requesting an accommodation that allowed him to continue work in the present, but rather, in the future—at some indefinite time. . . . [A]n accommodation is unreasonable if it does not allow someone to perform his or her job duties in the present or in the immediate future.").

Accordingly, the Court finds that Defendant is not entitled to summary judgment on Plaintiff's ADA failure to accommodate claim to the extent that claim is based on Defendant's conduct during and after March 2020.

## II.    ADA Retaliation Claim

Defendant also moves for summary judgment on Plaintiff's ADA retaliation claim. (Doc. 26, pp. 19–22.) Under the ADA's anti-retaliation statute, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a); see Connelly, 758 F. App'x at 832 ("To state a retaliation claim under the ADA, an employee must show that her employer discriminated against her for opposing an act or practice made illegal under the ADA."). Like with disability discrimination claims, federal courts evaluate ADA retaliation claims using what is referred to as the McDonnell Douglas burden-shifting framework. Connelly, 758 F. App'x at 832. To establish a *prima facie* case of retaliation, a plaintiff must show: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action;

and (3) that there was a causal link between the adverse action and the protected activity. Stevens v. S. Nuclear Operating Co., Inc., 209 F. Supp. 1372, 1381 (S.D. Ga. 2016) (citing Lucas, 257 F.3d at 1260–61). "Once a *prima facie* case is established, the burden then shifts to the defendant employer to come forward with a legitimate[,] non-discriminatory reasons for its actions that negate the inference of retaliation." Happy Herman's Cheshire Bridge, Inc., 117 F.3d at 1287. "The plaintiff must then demonstrate that it will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." Id.

In this case, the parties dispute the second element of the prima face case. (See doc. 26, pp. 19–22; doc. 35, pp. 14–15; doc. 37, pp. 15–18.) According to Defendant, Plaintiff cannot show that she suffered an adverse employment action. (Doc. 26, pp. 19–22.) Plaintiff, on the other hand, points to the final written warning she received in September 2019 and the "continuing denial of the accommodation she was seeking." (Doc. 35, pp. 14–15.) Plaintiff also contends that she was constructively discharged by Defendant. (Id. at pp. 19–20.) "For ADA retaliation purposes, '[a]n adverse employment action is any act by the employer that dissuades a reasonable employee from engaging in the protected activity.'" McClain v. Tenax Corp., 304 F. Supp. 3d 1195, 1206 (S.D. Ala. 2018) (quoting Santandreu v. Miami Dade County, 513 F. App'x 902, 906 (11th Cir. 2013)). "An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment. . . . A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Martin v. Eli Lilly & Co., 702 F. App'x 952, 956 (11th Cir. 2017) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).

The Court finds that Plaintiff has failed to show that the "final written warning" constitutes an adverse employment action for purposes of her ADA retaliation claim.  While "[a] reprimand that has a meaningful adverse effect on an employee's working conditions may be cognizable," a reprimand "does not constitute an adverse employment action when the employee suffers no tangible harm as a result." Melton v. Nat'l Dairy LLC, 705 F. Supp. 2d 1303, 1321–22 (M.D. Ala. 2010).  Here, Plaintiff concedes that the written warning did not change her employment status, decrease her wages or commissions, or change her schedule.  (Doc. 33-1, p. 33.)  Therefore, the written warning did not result in a "tangible, negative effect" on Plaintiff's employment and thus does not constitute an adverse employment action.  Martin, 702 F. App'x at 956; see Barnett v. Athens Reg'l Med. Ctr., Inc., 550 F. App'x 711, 713 (11th Cir. 2013) ("Barnett has failed to establish . . . [that] he was . . . subjected to an adverse employment action.  The written reprimands and negative performance review had no effect on Barnett's employment.  Indeed, Barnett admitted that his two written reprimands did not result in his termination, demotion, suspension, a reduction in pay, or a change in job duties."); Manley v. DeKalb County, 587 F. App'x 507, 513 (11th Cir. 2014) ("Manley subjectively believed that the two write-ups she received after her appeal were retaliatory, but nothing in the record suggests that she suffered a materially adverse employment action.  Indeed, there was no reduction in pay, benefits, or responsibilities that would demonstrate an adverse effect."); Medearis v. CVS Pharm., Inc., 646 F. App'x 891, 898 (11th Cir. 2016) (finding that written reprimands did not constitute adverse employment actions where the written reprimands did not cause "a loss of pay or benefits, further discipline, or denial of a promotion"); Errickson v. Lakeland Reg'l Med. Ctr., Inc., No. 8:22-cv-533-VMC-CPT, 2022 WL 1487588, at *3 (M.D. Fla. May 11, 2022) ("Errickson has not plausibly alleged that the write-ups or reprimand she received or the second fitness for duty examination were adverse employment

actions. This is because she has not alleged that she suffered a tangible harm such as a loss of pay, a raise, or a promotion, because of these actions.").

The Court also finds that Defendant's "continuing denial" of Plaintiff's requested accommodations is insufficient to constitute an adverse employment action. Plaintiff argues that "[s]he suffered harm in the continuing denial of the accommodation she was seeking" and that that harm constitutes an adverse employment action. (See doc. 35, p. 15.) More specifically, Plaintiff contends that she was retaliated against for engaging in the "protected activity" of trying to remove "offending cleaners" from the Store and "seeking compliance with her accommodation" on September 22 and 23, 2019. (Doc. 35, p. 15.) However, "the mere denial of a request for a reasonable accommodation cannot be an adverse employment action giving rise to a separate ADA retaliation claim." McClain, 304 F. Supp. 3d at 1206–07; see Cooke v. Carpenter Tech. Corp., No. 5:19-CV-00115-AKK, 2020 WL 6562359, at *7 (N.D. Ala. Nov. 9, 2020) ("[T]he denial of the requested accommodations cannot itself be the adverse employment action. Otherwise, every denial of a requested accommodation, whether reasonable or not, would give rise to a retaliation claim."). Indeed, "[w]ere the law otherwise, every time an employee was denied a requested accommodation, [s]he would be able to 'double dip' by asserting both ADA failure-to-accommodate and ADA retaliation claims." McClain, 304 F. Supp. 3d at 1206; see Floyd v. Lee, 968 F. Supp. 2d 308, 334 (D.D.C. 2013) ("[I]f the denial of a request for accommodation could itself support a claim of retaliation based on the request, then every failure-to-accommodate claim would be doubled."); Sacks v. Bd. of Educ. of Baltimore Cnty., No. RDB-21-968, 2021 WL 5233752, at *6 (D. Md. Nov. 9, 2021) ("A denial of a request for accommodation may not on its own form the basis for a retaliation claim under the ADA."). Therefore, the Court finds that

34

Defendant's purported denial of Plaintiff's requested accommodations does not constitute an adverse employment action for purposes of Plaintiff's ADA retaliation claim.

Finally, the Court is unpersuaded by Plaintiff's constructive discharge theory. Constructive discharge occurs "when an employer deliberately makes an employee's working conditions intolerable and thereby forces [her] to quit [her] job."[8] Palmer v. McDonald, 624 F. App'x 699, 704 (11th Cir. 2015) (emphasis added) (citing Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009)). The Eleventh Circuit has held that "[a] constructive discharge qualifies as an adverse employment action." Menzie v. Ann Taylor Retail, Inc., 549 F. App'x 891, 894 (11th Cir. 2013) (citing Durley v. APAC, Inc., 236 F.3d 651, 657 (11th Cir. 2000)); see e.g., Akins, 420 F.3d 1293 at 1300–01; see also Powrzanas v. Jones Utility & Contracting Co., No. 2:17-cv-975-GMB, 2019 WL 4305612, at *7 (N.D. Ala. Sept. 11, 2019) ("[C]onstructive discharge is a sufficient adverse employment action for retaliation purposes.") (citing Bozeman v. Per-Se Techs., Inc., 456 F. Supp. 2d 1282, 1235 (N.D. Ga. 2006)). To establish constructive discharge as an adverse employment action, a plaintiff must show that "working conditions were so intolerable that a reasonable person in her position would have been compelled to resign." Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997); see Griffin, 182 F.3d at 1283–84. "This objective standard sets a high threshold; it requires a plaintiff to show harassment that is more severe or pervasive than the minimum level required to establish a hostile working environment." Menzie, 549 F. App'x at 895 (citing Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001)). Furthermore, the Eleventh Circuit has "required pervasive conduct by [the] employer before

---

[8] In her Response, Plaintiff appears to construe her "constructive discharge" theory as a separate claim under the ADA. (See doc. 35, pp. 19–20.) However, "a constructive discharge is actually only an adverse employment action and thus only an element of a claim." Burden v. Int'l Longshoremen's Ass'n, Local No. 1410, 510 F. Supp. 2d 618, 625 (S.D. Ala. 2007) (citing Rowell v. BellSouth Corp., 433 F.3d 794, 806–07 (11th Cir. 2005); Akins v. Fulton County, 420 F.3d 1293, 1300–01 (11th Cir. 2005); Griffin v. GTE Fla., Inc., 182 F.3d 1279, 1283–84 (11th Cir. 1999)).

finding that . . . a constructive discharge occurred." Id. (quoting Hipp, 252 F.3d at 1231).  Notably, "the denial of an accommodation could amount to a constructive discharge." Cooke, 2020 WL 6562359, at *7 (citing Hicks v. City of Tuscaloosa, 870 F.3d 1253, 1261 (11th Cir. 2017)).

Plaintiff contends that she was constructively discharged through Defendant's failure to grant her reasonable accommodations as the Store's working conditions (without such accommodations) "threatened both her health and her life." (Doc. 35, p. 19.)  However, "an employer's failure to accommodate a disability does not automatically create a claim of constructive discharge, although possibly a '*complete failure* to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge.'" Cathey v. Wake Forest Univ. Baptist Med. Ctr., 90 F. Supp. 3d 493, 508 (M.D.N.C. 2015) (emphasis added) (quoting Johnson v. Shalala, 991 F.2d 126, 132 (4th Cir. 1993)).  Here, Plaintiff failed to present sufficient evidence showing that Defendant's actions amounted to a "complete failure" to accommodate or that Defendant "intentionally rendered [Plaintiff's] working conditions so intolerable based on . . . [her] disability." Dant v. Beaulieu of Am., Inc., No. 4:06-CV-053-RLV-WEJ, 2007 WL 9710721, at *21 (N.D. Ga. Aug. 13, 2007).  Though a question of material fact exists as to whether Defendant failed to provide a reasonable accommodation to Plaintiff during the COVID-19 pandemic, see Discussion Section I.C, Defendant did reasonably accommodate Plaintiff for several months prior to the COVID-19 pandemic, see Discussion Section I.B.   Indeed, the reason Defendant stopped providing Plaintiff a reasonable accommodation in March 2020 was because of the COVID-19 pandemic. See id.  Thus, Plaintiff cannot demonstrate that Defendant "complete[ly] fail[ed] to accommodate [Plaintiff] in the face of repeated requests" for accommodation. Cathey, 90 F. Supp. 3d at 508 (quoting Johnson, 991 F.2d at 132).  Furthermore, in April 2020, after the Store re-opened, Mizell made multiple offers

to Plaintiff to return to work. (See doc. 33-1, pp. 41–42.) Though Plaintiff declined these offers because the Store was using cleaners that may trigger her allergies due to the COVID-19 pandemic, (see id.), Plaintiff has failed to point to any evidence showing that Defendant actually wanted her to quit, (see doc. 35, pp. 19–20); see also Bozeman, 456 F. Supp. 2d at 1355 ("Plaintiff's constructive discharge claim fails for the additional reason that he has failed to put forth any evidence that the defendants wanted him to quit. Instead, the undisputed evidence shows that Per-Se continued to communicate with the Plaintiff while he was on approved leave, and coordinated and prepared for him to return to work."). Indeed, the undisputed evidence shows Defendant stopped providing the reasonable accommodation of the Purell Healthcare Spray and resorted to cleaners harmful to Plaintiff because of the health threat posed by the COVID-19 pandemic. See Discussion Section II.A & B. Thus, the Court finds that Plaintiff failed to provide evidence showing that Defendant deliberately drove Plaintiff from her position as a sales associate. See Johnson, 991 F.2d at 131–32 (holding that the elements of a constructive discharge are not met by failure to accommodate without "evidence that the employer intentionally sought to drive [the employee] from her position").

Based on the foregoing, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's ADA retaliation claim.

III.    **ADA Hostile Work Environment Claim**

Plaintiff alleges that Defendant subjected her to a hostile work environment in violation of the ADA. (Doc. 1, pp. 19–20.) However, before a plaintiff may pursue an ADA claim in federal court, the plaintiff must present those claims to the EEOC so that the EEOC has the "first opportunity to investigate the alleged discriminatory practices [and] . . . perform its role in obtaining voluntary compliance and promoting conciliation efforts." Gregory v. Ga. Dep't of

37

Human Res., 355 F.3d 1277, 1279 (11th Cir. 2004); see Zillyette v. Cap. One Fin. Corp., 179 F.3d 1337, 1339 (11th Cir. 1999) ("It is settled law that, under the ADA, plaintiffs must comply with the same procedural requirements to sue as exist under Title VII . . . ."). Therefore, "[a] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Mulhall v. Advance Sec., Inc., 19 F.3d 586, 589 n.8 (11th Cir. 1994). "[A]llegations of new acts of discrimination" contained in a plaintiff's complaint but not in an EEOC charge are "inappropriate." Batson, 897 F.3d at 1327. To determine whether an EEOC charge raises the claims alleged in a complaint, "the proper inquiry . . . is whether [the plaintiff's] complaint [is] like or related to, or grew out of, the allegations contained in [the] EEOC charge." Gregory, 355 F.3d at 1280. However, while new acts of discrimination are impermissible, courts should be "extremely reluctant to allow procedural technicalities to bar claims brought under" the ADA. Id. Thus, the scope of an EEOC complaint should not be strictly construed. Id. Defendant argues that it is entitled to summary judgment on the hostile work environment claim because "[n]owhere [in the EEOC Charge] does [Plaintiff] even obliquely reference any allegations that suggest an intent to have the EEOC investigate a hostile work environment." (Doc. 26, p. 24.) Plaintiff responds that she exhausted her administrative remedies as to the hostile work environment claim because the EEOC Charge "fairly describes a work environment in which her life has been threatened for almost three month[s]" and that "an inference exists [from the EEOC Charge] that the threat could be intentional." (Doc. 35, p. 21.)

To establish a hostile work environment claim under the ADA, "the plaintiff must show that [the] workplace is permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Ramon v. AT&T Broadband, 195 F. App'x 860, 866 (11th Cir.

2006) (quotations omitted) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Here, the EEOC Charge states, in pertinent part, that Defendant "has consistently failed to provide the reasonable accommodation of removing [harmful] chemicals which caused a severe and life-threatening reaction on or about July 2, 2019." (Doc. 1-1, p. 2.) The EEOC Charge further states that Plaintiff received a "final warning" and believes she has "been discriminated and retaliated against due to [her] disability, in violation of the [ADA]." (Id.) However, the EEOC Charge neither points to the kind of pervasive and oppressive conditions that show "[Plaintiff] intended to have the EEOC investigate the workplace for a hostile work environment," Ramon, 195 F. App'x at 866, nor discusses the "general conditions of employment that would support a hostile work environment claim," Kelly v. Wal-Mart Stores E., LP, No. 3:18-cv-149-WKW-GMB, 2019 WL 1066065, at *8 (M.D. Ala. Feb. 15, 2019), *reported and recommendation adopted*, 2019 WL 1061663, at *1 (M.D. Ala. Mar. 6, 2019). Indeed, the EEOC Charge does not allege any "acts of harassment" but only references "discrete instances of discrimination" (i.e., the failures to accommodate her disability and the issuance of a "final warning"). Freeman v. Koch Foods of Ala., 777 F. Supp. 2d 1264, 1278 (M.D. Ala. 2011). While Plaintiff alleged that Defendant "consistently failed" to "remov[e] [harmful] chemicals," (doc. 1-1, p. 2), that factual allegation is related to the events surrounding Plaintiff's failure to accommodate claim and makes no mention of the general work environment or acts of harassment. See Brown v. Mobile Cnty. Comm'rs, No. 14-00343-KD-C, 2015 WL 1444965, at *4 (S.D. Ala. Mar. 30, 2015) ("The Plaintiff stated in her charge that the discrimination occurred on the date of her termination. In her narrative statement, she specifically referred to the incidents surrounding her termination, without any discussion of more general discrimination that could be construed as encompassing her . . . hostile work environment claim[].") Finally, Plaintiff did not mention a hostile work environment anywhere

39

within the EEOC Charge and, instead, alleged that she had been "discriminated against and retaliated against." (Doc. 1-1, p. 2.) While Plaintiff alleged facts in the EEOC Charge that encompass failure to accommodate and retaliation claims, (see id.), those facts would not prompt the EEOC, under a reasonable investigation, to investigate for a hostile work environment. Therefore, "[a]lthough [the Eleventh] Circuit liberally construes EEOC charges that are prepared without the assistance of counsel," Edmonds v. Southwire Co., 58 F. Supp. 3d 1347, 1355 (N.D. Ga. 2014), the Court finds that Plaintiff failed to exhaust her administrative remedies for purposes of her hostile work environment claim. See Green v. Elixir Indus., Inc., 152 F. App'x 838, 841 (11th Cir. 2005) ("Nothing in Green's EEOC charge related to incidents of harassment, nor did anything mention the date on which they occurred. Because the facts alleged in Green's EEOC charge form cannot be said to encompass a hostile work environment claim, we affirm the district court's finding that his claim was therefore procedurally deficient."); Freeman, 777 F. Supp. 2d at 1278 (finding that plaintiff's EEOC charge did not raise an ADA hostile work environment claim, in part, because plaintiff only alleged "discrete instances of discrimination" rather than "acts of harassment"); Hogan v. BellSouth Corp., 396 F. Supp. 2d 1333, 1349 (N.D. Ga. 2004) ("Plaintiff's EEOC charge alleges only the following adverse actions: she was denied a promotion, she was told that she would be subjected to a method of evaluation that was not applied to other attorneys, and she was terminated. The charge does not . . . allude to a hostile work environment. The court finds that the EEOC investigation triggered by the charge . . . is very different from what would have occurred if a hostile work environment had been alleged.").

Based on the foregoing, the Court finds that Defendant is entitled to summary judgment on Plaintiff's ADA hostile work environment claim.

40

## IV.     ADA Interference Claim

Plaintiff points out in her Response that her Complaint alleges an ADA "interference claim" under 42 U.S.C. § 12203(b) and that Defendant did not move for summary judgment on that "theory of liability." (Doc. 35, p. 16.) Defendant responds that it did move for summary judgment on Plaintiff's interference claim because it moved for summary judgment on the retaliation claim, which—according to Defendant—is "the only theory of liability [Eleventh Circuit courts] ha[ve] ever applied for 'interference' theories." (Doc. 37, p. 18.) Thus, Defendant argues, Plaintiff's interference claim fails for the same reason her retaliation claim fails. (See id. at pp. 18–19.)

As an initial matter, Defendant did not move for summary judgment on Plaintiff's interference claim. Indeed, Defendant's Motion for Summary Judgment does not mention the interference claim or the appropriate statute, 42 U.S.C. § 12203(b). (See doc. 26.) Rather, Defendant first argued for summary judgment on the interference claim in its Reply to Plaintiff's Response, (see doc. 37, pp. 2, 15, 18–19), and "[a]rguments raised for the first time in a reply brief are not properly before the reviewing court," United States v. Oakley, 744 F.2d 1553, 1556 (11th Cir. 1984). Though Defendant argues that it moved for summary judgment on the interference claim when it moved for summary judgment on Plaintiff's retaliation claim, (doc. 37, p. 18), Defendant did not indicate in its Motion for Summary Judgment in any way that its arguments with respect to Plaintiff's retaliation claim also applied to Plaintiff's interference claim. See Scott v. Social Involvement Missions, Inc., No. 1:17-4963-AT-CCB, 2020 WL 7237702, at *2 (N.D. Ga. Dec. 9, 2020) (finding waiver where "Defendant did not contend [in the motion for summary judgment] that its arguments with respect to Plaintiff's PDA claim also applied to her ADA claim,

or otherwise indicate in any way that it intended to rely on its PDA arguments for purposes [of] the ADA claim").

Even if Defendant had raised its arguments in a timely manner, the Court would still find that Defendant failed to show that it is entitled to summary judgment on the ADA interference claim.  At bottom, Defendant argues that an ADA interference claim "does not exist" in the Eleventh Circuit.  (Doc. 37, p. 18.)  According to Defendant, the Eleventh Circuit "treats those as retaliation claims."  (Id. at p. 2; see id. at pp. 18–19.)  Therefore, Defendant argues, it is entitled to summary judgment on Plaintiff's interference claim for the same reasons it is entitled to summary judgment on Plaintiff's retaliation claim (i.e., Plaintiff "suffered no adverse actions").  (Id. at pp. 18–19; see doc. 26, pp. 19–22.)  That is, Defendant asserts that Plaintiff did not suffer "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Martin, 702 F. App'x at 956 (quoting Burlington Indus, Inc., 524 U.S. at 761)); see Discussion Section II, supra.

Under the ADA's anti-interference provision, it is "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, . . . any right granted or protected by" the ADA.  42 U.S.C. § 12203(b); see Equal Emp't Opportunity Comm'n v. STME, LLC, 938 F.3d 1305, 1320–21 (11th Cir. 2019); Atchison v. Bd. of Regents of Univ. Sys. of Ga., 802 F. App'x 495, 506 (11th Cir. 2020).  However, contrary to Defendant's argument, the Eleventh Circuit has "not yet had occasion to explain the proper standard for evaluating an ADA anti-interference claim."  Atchison, 802 F. App'x at 508. Though Defendant urges the Court to apply a "retaliation analysis" to Plaintiff's anti-interference claim, (see doc. 37, pp. 18–19), other courts have relied on the Fair Housing Act's ("FHA") anti-

42

interference provision to determine the appropriate standard for ADA interference claims because the ADA's statutory language is identical to the FHA's statutory language.  See Frakes v. Peoria Sch. Dist. No. 150, 872 F.3d 545, 550–51 (7th Cir. 2017); Mosley v. AM/NS Calvert, LLC, No. 1:20-00517-KD-M, 2022 WL 843773, at *8 (S.D. Ala. Mar. 21, 2022); compare 42 U.S.C. § 3617 (FHA anti-interference statute), with 42 U.S.C. 12203(b) (ADA anti-interference statute); see also Northcross v. Bd. of Ed. of Memphis City Sch., 412 U.S. 427, 428 (1973) ("[T]he similarity of language [between two statutes] is . . . a strong indication that the two statutes should be interpreted *pari passu*.").  Relying on the elements of an FHA anti-interference claim, Plaintiff must show that (1) "she exercised a right protected by the ADA"; (2) her employer "coerced, intimidated, threatened, and/or interfered with her enjoyment of her ADA rights"; and (3) her employer's "actions were motivated because she exercised a right protected by the ADA."  Mosley v. AM/NS Calvert, LLC, 2022 WL 843773, at *8; see West v. DJ Mortg., LLC, 271 F. Supp. 3d 1336, 1361–62 (N.D. Ga. 2017) (discussing elements of FHA anti-interference claim); Sackman v. Balfour Beatty Communities, LLC, No. 1:13-cv-066, 2014 WL 4415938, at *10 (S.D. Ga. Sept. 8, 2014) (same).  Notably, Plaintiff does not need to show that she suffered an adverse employment action rising to the level required by an ADA retaliation claim.  See Mosley v. AM/NS Calvert, LLC, 2022 WL 843773, at *8.  This conclusion is further supported by the EEOC's Enforcement Guidance on Retaliation and Related Issues, which instructs that an ADA "interference claim is broader than a retaliation claim[] and *does not require a materially adverse employment action*."  Mosley v. AM/NS Calvert, LLC, No. 1:20-00517-KD-M, 2022 WL 703601, at *24 (S.D. Ala. Mar. 8, 2022) (emphasis added) (citing EEOC Enforcement Guidance on Retaliation & Related Issues, 2016 WL 4688886, at *26 (E.E.O.C. Guidance Aug. 25, 2016)).  Rather, for purposes of her ADA anti-interference claim, Plaintiff must show that she suffered "conduct that is reasonably

43

likely to interfere with the exercise or enjoyment of ADA rights" and that was "motivated by an intent to discriminate." Id. (quoting EEOC Enforcement Guidance on Retaliation & Related Issues, 2016 WL 4688886, at *27); see Frakes, 872 F.3d at 550–51. Thus, Defendant's arguments related to Plaintiff's ADA retaliation claim are not applicable to Plaintiff's ADA interference claim.

Based on the foregoing, the Court finds that Defendant has not shown it is entitled to summary judgment on Plaintiff's ADA interference claim.

## CONCLUSION

Based on the foregoing, the Court **GRANTS in part and DENIES in part** Defendant RTG Furniture Corporation of Georgia's Motion for Summary Judgment. (Doc. 26.) Specifically, the Court **GRANTS** the Motion for Summary Judgment on Plaintiff's ADA failure to accommodate claim as to Defendant's alleged conduct prior to March 2020; ADA retaliation claim; and ADA hostile work environment claim. (Id.) The Court **DENIES** the Motion for Summary Judgment on Plaintiff's ADA failure to accommodate claim as to Defendant's conduct after February 2020 and her ADA interference claim. (Id.)

**SO ORDERED**, this 26th day of August, 2022.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

44